**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:12-cv-02638-CMA-KMT

**STEPHANIE SPEIGHT**, individually and on behalf of all others similarly situated,

      Plaintiff,

v.

**BANKRATE, INC**., a Delaware corporation,

      Defendant.

---

**PLAINTIFF'S MOTION TO EXTEND DEADLINES FOR THE PARTIES**
**TO DESIGNATE CLASS CERTIFICATION EXPERTS AND**
**FILE PAPERS RELATED TO CLASS CERTIFICATION**

---

I.     **Introduction**

Plaintiff Stephanie Speight's ("Plaintiff" or "Speight") Motion for Class Certification is due August 20, 2013, but significant discovery remains outstanding (notwithstanding her diligent efforts to pursue it). In accordance with Federal Rule Civil Procedure 16(b), Local Rule 16.1, and Local Rule 6.1, Speight respectfully requests that the Court enlarge Plaintiff's deadlines to designate expert witnesses for issues related to class certification, to move for class certification, and to serve all information specified by Federal Rule Civil Procedure 26(a)(2), and for Defendant Bankrate ("Bankrate") to designate expert witnesses for issues related to class certification, file any response to Plaintiff's motion for class certification, and serve all information specified by Rule 26(a)(2). Plaintiff also seeks an extension for filing any reply in support of class certification.

As explained below, despite diligently pursuing this case (Plaintiff has deposed 5 Bankrate witnesses to date and additional depositions and subpoenas remain outstanding) additional time is needed to both obtain essential discovery from newly-identified third parties and gather further documents and deposition testimony from Bankrate. Bankrate unreasonably opposes the extension. As a result, this Court should grant the requested extension.

II.    **Factual Background**

***Plaintiff Speight's Claims under the TCPA and Class Certification Discovery***

This putative class action concerns Defendant Bankrate's placement of calls to consumers in violation of the Telephone Consumer Protection Act ("TCPA"). Despite

1

Plaintiff Speight's diligent efforts in trying to obtain discovery that would demonstrate how Bankrate obtained the "lead"[1] information it used to call her and others, at this time that process remains entirely unclear, with Bankrate unable to substantiate what consent language was used by its affiliates during the relevant period of time.

This much is known: Bankrate purchased Ms. Speight's lead and the proposed class members' leads from an affiliate[2] called "Inadco." Despite offering 5 different Bankrate deposition witnesses[3] the chance to indicate how the leads Bankrate purchased from Inadco were originated (i.e., how the website that Inadco used, www.branddealsonline.com, apparently operated by a company called SubscriberBASE, secured consent from the customer to be called about Insurance). Bankrate's witnesses could only guess what that process would've entailed (though

---

[1] A "lead" in this context refers to information (name, phone number, address, DOB, and even potential personal health information) about an individual who might be interested in purchasing health or life insurance. Bankrate's business is to obtain such leads and then sell them to insurance brokers. Bankrate acquires leads through its own operated websites (of which there are approximately 7,000), and through its network of affiliate marketers (see footnote 2, *infra*) who manage their own websites. This case focuses only on leads that Bankrate purchased from a specific affiliate, Inadco, and on the leads that Inadco sold to Bankrate that had originated from a website known as www.branddealsonline.com (presently viewable as www.branddealonline.com).

[2] "Affiliate" as used in the Internet marketing industry doesn't necessarily imply the common ownership of separate entities central to the term's legal meaning. Affiliate in this context instead refers to marketers and other companies that "do business with" each other. Thus, in the Internet world, Inadco is a Bankrate affiliate, and the owner of www.branddealsonline.com (SubscriberBASE) is an affiliate of Inadco—notwithstanding the fact that there's no common ownership among any of them.

[3] To date, Plaintiff has deposed two Rule 30(b)(6) designees on 10 topics (Bradley Cooper and Tricia Winkler), as well as Bankrate's Chief Information Officer (Bethany Baer), its Vice President in charge of managing affiliate accounts (Matt Rihtar), and the account manager directly responsible for managing Bankrate's relationship with Inadco prior to termination (Robin Skzyrpek). None of them were able to describe at all how Inadco supposedly obtained customer consent, other than presuming it used the www.branddealsonline.com website to somehow drive traffic to "health and life capture pages."

Bankrate presumes that two consent capture pages it received from Inadco in an email in June 2012 were in use and that those pages secured consent from everyone).

Critically, up until four days ago, Bankrate had maintained that information verifying the process used to obtain consumer consent should be available from Inadco.[4] Plaintiff first issued a subpoena to Inadco back on May 13, 2013.[5] (Woodrow Decl ¶ 7.) Following requests by Inadco's counsel for extensions, finally, on August 1, 2013, Inadco's lawyers revealed that a previously-undisclosed entity—UQDirect—was responsible for transmitting the leads that Inadco was selling to Bankrate from www.branddealsonline.com to Bankrate's NetQuote platform. (*Id.* ¶ 23.) That is, Inadco claims that it was obtaining the leads that Bankrate was buying from it (and using to call putative class members) from UQDirect, who in turn was acquiring at least some of the leads from www.brandealsonline.com. According to Inadco's lawyers, UQDirect was transmitting the lead data to Bankrate's electronic platform. ((*Id.* ¶ 7.) On August 2, 2013, a day after learning about UQDirect's alleged involvement, Speight promptly issued subpoenas to both UQDirect and SubscriberBASE[6] for information regarding the

---

[4] Notably, Bankrate failed to disclose Inadco (or SubscriberBase or UQDirect) in its Rule 26(a)(1) disclosures. Indeed, despite its disclosure obligations, Bankrate didn't disclose Inadco's involvement at all until April 16, 2013. Further, it appears that Bankrate didn't even know that UQDirect was involved in the transmission of the leads at issue in this case until 4 days ago (despite the fact that Bankrate was relying on these entities to adequately structure their websites so as to ensure that consent to be called was being obtained).

[5] Inadco's designated agent in California initially refused to accept service, forcing Plaintiff to reattempt service on its agent in Delaware. (Woodrow Decl. ¶ 7.) Plaintiff was finally successful in serving Inadco on June 4, 2013.

[6] SubscriberBASE was served on August 5, 2013.

generation of leads that were sold by Inadco to Bankrate and the ability to identify those leads that originated via www.branddealsonline.com during the class period. (*Id.* ¶ 9.)

***In light of Inadco's Inability to Describe the Consent Capture Process, Substantial Discovery Remains Outstanding.***

At this time, for class certification Plaintiff needs the entity responsible for obtaining consent from the consumer to actually explain how such consent was obtained. Likewise, Plaintiff also needs to understand the data that newly-disclosed entity UQDirect has regarding the leads it drove to Bankrate on Inadco's behalf as well as the data that was transmitted to Bankrate so that it may be determined whether putative class members can be ascertained in a manageable way. Again, Bankrate—despite having responsibility under the TCPA to ensure that it receives actual consent to call consumers prior to doing so—has been unable to provide this information or otherwise show that any supposed "consent pages" that it has produced were actually shown to customers such that consent was actually obtained. Such information must be gathered from UQDirect and SubscriberBASE.

Additionally, certain reports and other documents remain outstanding from Bankrate. Likewise, Plaintiff has yet to depose other important Bankrate witnesses, including Kyle Ralph, the account manager at Bankrate who managed the Inadco relationship and lead feeds prior to Robin Skzyrpek. Other witnesses regarding Bankrate's data that it maintains with respect to its Inadco leads may become necessary depending upon Bankrate's answers to further discovery.

***Despite the Need for Further Discovery, Bankrate Opposes Plaintiff's Request for Additional Time.***

Despite the fact-checking that remains to be done to nail down which process was specifically used to obtain consumer consent—and notwithstanding Bankrate's inability to describe the process beyond presuming that certain consent pages were displayed (and its own misunderstanding until four days ago regarding which entity was actually driving lead traffic to its platform which it was then using to call people)— Bankrate refuses to agree to the enlargement of any deadlines. (Woodrow Decl. ¶ 12.) This is unreasonable. Plaintiff's deadlines to provide an expert report regarding certification is due August 6, 2013 and the deadline for the certification motion is presently August 20, 2013. At this time, and given Bankrate's failure/inability to provide basic information regarding where its leads originated from, Plaintiff would be forced to file a certification brief that is incomplete and for several sections would merely detail the discovery that remained outstanding.

Accordingly, and as explained in further detail below, this Court should enlarge the deadlines for Plaintiff to produce her expert report and file her Motion for Class Certification for 60 days, or until October 18, 2013 so that information may be obtained from the newly disclosed third party UQDirect and SubscriberBASE, so that Bankrate can produce its remaining documents and witnesses, and so that the Court has an adequate record from which it can evaluate the class certification under Rule 23.

## III.    ARGUMENT

Rule 16(b)(4) of the Federal Rules of Civil Procedure provides that "[a] schedule may be modified only for good cause and with the judge's consent." Similarly, Local

Rule 16.1 provides a scheduling order shall only be modified "upon a showing of good cause and by leave of court." "Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts." *Pumpco, Inc. v. Schenker Int'l, Inc.*, 204 F.R.D. 667, 668 (D. Colo. 2001) (quoting *Colorado Visionary Acad. v. Medtronic, Inc.,* 194 F.R.D. 684, 687 (D. Colo. 2000) (quotation omitted).

In this case, Plaintiff has diligently pursued discovery. Indeed, if anything, Bankrate's chief complaint is that too much discovery has already taken place. (Woodrow Decl. ¶ 13.) The problem with this is that Bankrate has offered nothing to substantiate the process that was used to obtain the leads at issue in this case, specifically the procedure used to direct consumers to pages where they supposedly gave consent to be called. Likewise, Bankrate has not disclosed the types of data that Bankrate possesses regarding the leads it acquired that were originated via Inadco/UQDirect through the www.branddealsonline.com website, forcing Ms. Speight to get the information from Inadco (and given its apparent ignorance in this regard, now UQDirect and SubscriberBASE). This procedure and associated data will reveal whether an ascertainable class of consumers was subjected to the same consent capture process, governed by identical terms.

Accordingly, not only has Plaintiff pushed ahead with the required fervor to support a finding of good cause, the information that remains undiscovered is directly relevant to class issues of commonality and ascertainability. Likewise, documents and deposition testimony from Bankrate remain outstanding.

A.     **Plaintiff has pursued discovery with diligence.**

Bankrate—whose chief lawyer on the case has lamented that this litigation "takes up all [his] time"—can hardly complain that Plaintiff hasn't diligently pursued this litigation. (Woodrow Decl. ¶ 13.) Plaintiff has provided discovery responses to Bankrate and has issued interrogatories, requests to produce, and requests to admit. Plaintiff Speight has sat for her deposition, and her lawyers have taken five depositions of Bankrate witnesses, including the 30(B)(6) depositions of two of Bankrate's designees and three other fact witnesses identified in Bankrate's initial disclosures.

Plaintiff has likewise diligently sought discovery from necessary third parties, including Five9—the sole third party that Bankrate identified in its initial disclosures. In response to a subpoena, Five9 produced over 1,000 pages of documents confirming that its auto-dialer technology, which Bankrate used, qualifies as covered equipment under the TCPA.

On June 4, 2013, Plaintiff served a subpoena on Inadco. (*Id.* ¶ 7.) Following multiple extension requests, Inadco finally revealed on August 1, 2013 that it had acquired the leads that it was selling to Bankrate from UQDirect. *Id.* On August 2, 2013, Plaintiff's counsel issued subpoenas to UQDirect and SubscriberBase. (*Id.* ¶ 9.)

It is true that the certification briefing deadlines were previously extended by the Agreement of the Parties with the approval of the Court on two prior occasions. (*See* Dkts. 34, 38; *see also* Woodrow Decl. ¶ 17.) Good cause for those extensions, however, existed independently of the need to complete discovery that underlies the instant request. (Woodrow Decl. ¶ 17.) Indeed, the prior extensions were sought as a

result of Plaintiff's counsel's loss of both his grandmother and father in a span of three weeks in April 2013, which required him to travel for bereavement purposes. *Id.* Plaintiff's counsel also had to undergo lead replacement surgery for his implantable cardioverter defibrillator ("ICD") unit, which took him away from the office for a period of time. *Id.*

Furthermore, the prior extensions were necessitated, in part, by Bankrate's production of false evidence in the case. (*Id.* ¶ 18.) Rather than produce the lead information for Ms. Speight as requested by Plaintiff, Bankrate re-typed information that one of its employees had received in an email from Inadco regarding the lead information Inadco had regarding Speight's phone number. In the process of "re-typing" this information, Bankrate (or someone working at the behest of its attorneys in this case) transposed the digits of one of the two telephone numbers gathered in the lead. (*Id.* ¶ 19.)

Such a transposition suggested that whatever process was used to get Ms. Speight's phone number, it involved the consumer entering her phone number twice and that in Speight's case two different numbers had been entered. *Id.* This sent Plaintiff's lawyers down a path for several weeks researching whether it would be possible to ascertain whether other people were called as a result of two different phone numbers being entered. *Id.* Ms. Speight in fact testified that it was her understanding of the case, based on this (unknown to her at the time) false evidence, that the class consisted of her and others who had been called by Bankrate where the two phone numbers provided differed from each other. It was not until June 14, 2013 that

Bankrate's lawyers informed Plaintiff's counsel that the entry of two different phone numbers was not the actual evidence and that the documents showing such errors had been manufactured by Bankrate (or its attorneys). (*Id.* ¶ 19.) Thus, it was based on its own provision of inaccurate lawyer-made evidence that Bankrate previously consented to enlarge the certification deadlines.

Accordingly, Plaintiff has been diligently pursuing this matter notwithstanding her counsel's loss of close family members and need for lead replacement surgery, and even despite Bankrate's lawyers' fabrication of misleading evidence. In light of Plaintiff's diligence, this Court should have little trouble finding good cause to support the requested extension.

**B.    Critical discovery from Inadco, UQDirect, and SubscriberBASE remains outstanding.**

Plaintiff has requested, and Bankrate has indicated that it has produced, all the documents in its possession regarding the appearance of the www.branddealsonline.com website. However, Bankrate has not produced any copies of the www.branddealsonline.com website as it existed in August 2012, which Plaintiff needs so that she can determine how and whether the website supposedly secured consumer consent under the TCPA for Bankrate to call them.

At this point it is unclear—and Bankrate's witnesses haven't been able to answer—how Inadco or NQDirect or SubscriberBASE were driving traffic from www.branddealsonline.com to Bankrate. For example, at this point Plaintiff still does not know, and Bankrate's witnesses could not describe, how Inadco used www.branddealsonline.com to route traffic to its "consent capture" pages. At this point it

could have been done via banner ads on the website, through an embedded offer (www.branddealsonline.com offers a "free" Xbox, Playstation, or Nintendo Wii to consumers who complete a certain number of "offers"), through a "cross-sell" or remarketing, or perhaps through other channels. Bankrate's witnesses had no knowledge of the www.branddealsonline.com as it appeared at any time, let alone in August 2012 before Bankrate terminated Inadco as a lead generator. Rather, Bankrate indicated that such information would need to be obtained from Inadco. (Woodrow Decl ¶ 22.)

As indicated above, on August 1, 2013, after requesting and receiving multiple extensions, Inadco finally revealed that the integration for sending Inadco leads to Bankrate occurred between a new third-party, UQDirect, and Bankrate's Netquote platform. Though Inadco's lawyers indicated that they presumed the "consent capture" pages were featured as embedded offers on the www.branddealsonline.com during August 2012, they indicated that their client couldn't be certain and that UQDirect, should have such information. (*Id.* ¶ 23.) Apparently, UQDirect should have evidence regarding the extent of the data that Bankrate received with respect to leads generated by www.branddealsonline.com and how the website appeared in August 2012.

Plaintiff undoubtedly needs this information. For example, the www.branddealsonline.com website indicates that consumers who engage in its offer pages—assuming that back in August 2012 the consent capture pages were part of those offers—consent to be called by entities that appear on its "List of Marketing Partners" and the "marketing partners listed in the privacy policy." (*Id.*) Bankrate has not

shown *any* list of marketing partners that its name appears on, nor any copy of any privacy containing such a list. As this language appears to limit the scope of consent provided on the website[7], understanding at which point in the process the offer pages were shown is crucial to understanding whether Bankrate can claim it obtained consent through those pages.

In addition to understanding whether the consent pages were displayed as an embedded offer and whether Bankrate was listed on the "list of Marketing Partners" in August 2012, Plaintiff also needs to understand the data transferred from UQDirect to Bankrate's NetQuote platform. Basically, when a lead is generated and offered for sale by Inadco to Bankrate, Bankrate receives certain information about the lead. Bankrate's witnesses couldn't answer whether, with respect to its Inadco leads, it received any "Subsource ID" or "Referring URL" that would allow Plaintiff to manageably ascertain which Inadco leads came from www.branddealsonline.com as opposed to other sources. (*Id.* ¶ 27.)

Accordingly, given Bankrate's inability to provide information about the very leads it was using to call consumers, Plaintiff needs to get such evidence—including the appearance of the www.branddealsonline.com website as it appeared in August 2012 and information about the data that UQDirect was sending Bankrate on Inadco's behalf

---

[7] Bankrate's Vice President who was previously in charge of overseeing third party affiliate accounts, Matt Rihtar, testified that despite his 6 years of overseeing such affiliates, he would need the assistance of an attorney to decipher whether the www.branddealsonline.com website or the capture pages that Bankrate relies on were sufficiently set up to obtain consumer consent to be called. (Woodrow Decl. ¶ 26.). If Bankrate's own Vice President cannot make heads or tails of the website language, how can Bankrate assert the average consumer is capable of doing so? In any case, whether and how the language was presented, and the legal implications of such disclosures are classwide issues.

and specifically whether such data can be used to ascertain class membership—from

UQDirect and SubscriberBASE. Without the benefit of the above-referenced discovery,

Ms. Speight lacks substantial and meaningful information necessary to provide the

Court with a sufficient information regarding how Bankrate supposedly obtained consent

to call consumers or an adequate record from which to adjudicate Rule 23's

considerations.

### C.      Documents and deposition testimony remain outstanding from Bankrate.

In addition to needing discovery from Inadco, UQDirect and SubscriberBASE,

discovery remains outstanding from Bankrate as well. Bankrate has yet to produce

necessary "Price Pres" reports and other documents related to its monitoring of the

Inadco leads it was purchasing. (*Id.* ¶ 29.) Likewise, Plaintiff is waiting for Bankrate to

confirm the type of data it possesses in relation to the Inadco leads (which Bankrate's

CIO Bethany Baer confirmed is still stored in Bankrate databases). (*Id.*) Specifically,

Plaintiff needs to know whether Bankrate's Inadco lead information contains populated

fields for "Subsource ID" and/or "Referring URL." Discovering this information is relevant

to determining whether there are manageable ways based on Bankrate's data alone to

ascertain which of the Inadco leads that Bankrate used to place telephone calls were

originated from www.branddealsonline.com versus some alternative source, or whether

such information must be obtained from Inadco, UQDirect, and SubscriberBASE. (*Id.*)

Additionally, the depositions of several Bankrate witnesses remain outstanding.

First, Bankrate finally indicated on July 31, 2013 that Kyle Ralph, a former Bankrate

employee who managed the Inadco relationship prior to his departure from the

company in or around June 2012, is only available the week of August 9, 2013—a date *after* Plaintiff's expert disclosure deadline. (Woodrow Decl. ¶ 30.)  Plaintiff has been asking Bankrate for information regarding Mr. Ralph's whereabouts so that they could serve him for several months. (*Id.*) That Bankrate finally reveals Mr. Ralph's whereabouts only in connection with its indication that it will be representing him in these proceedings for a deposition after Plaintiff's expert deadline is indicative of Bankrate's approach to have the clock run out on Ms. Speight rather than affording her a reasonable opportunity to prove her case.

Furthermore, Plaintiff may need the deposition testimony of one or two other Bankrate witnesses regarding the specific database schema (the database fields) that would have been populated to allow Inadco (or now, UQDirect) to integrate electronically with Bankrate's NetQuote platform. (*Id.* ¶ 31.) Plaintiff anticipates that if the information was not only collected from consumers but also passed to Bankrate, these third parties are going to argue that Bankrate should in fact have the requested information.

Accordingly, as both documents and deposition testimony remain outstanding, Bankrate's refusal to consent to any extension of the class certification deadlines is manifestly unreasonable.

### D.   Plaintiff's Proposed New Schedule

Given the current deadlines and the level of discovery that remains outstanding, Plaintiff Speight seeks a 60-day enlargement of the deadlines as follows:

|  | Current Deadline | Proposed Deadline |
|---|---|---|
| Plaintiff's deadline to disclose the name of any expert witness relating to issues of class certification and the subject matter of any opinion(s) that expert intends to render | Aug. 6, 2013 | October 4, 2013 |
| Plaintiff's deadline to move for class certification and serve all information specified by Fed. R. Civ. P. 26(a)(2) | Aug. 20, 2013 | October 18, 2013 |
| Defendant's deadline to disclose the name of any expert witness relating to issues of class certification and the subject matter of any opinion(s) that expert intends to render | Oct. 4, 2013 | Dec. 3, 2013 |
| Defendant's deadline to respond to the motion for class certification and serve all information specified by Fed. R. Civ. P. 26(a)(2) | Oct. 18, 2013 | Dec. 17, 2013 |

| Plaintiff's deadline to file reply in support of the motion for class certification | Nov. 8, 2013 | Jan. 14, 2014 |
|---|---|---|
| Parties' deadline to serve written discovery | Oct. 28, 2013 | Dec. 31, 2013 |
| Discovery cut-off | Nov. 25, 2013 | Jan. 31, 2013 |
| Parties' deadline to disclose the name of any expert witness not related solely to class certification issues and provide opposing counsel all information specified in Fed. R. Civ. P. 26(a)(2) | Nov. 4, 2013 | Jan. 3, 2014 |
| Parties' deadline to designate rebuttal experts not relating solely to class certification issues and provide opposing counsel all information specified in Fed. R. Civ. P. 26(a)(2) | Dec. 24, 2013 | Feb. 14, 2014 |
| Parties deadline to file dispositive motions | Jan. 3, 2014 | March 14, 2014 |
| Final pretrial conference | Mar. 18, 2014 | SAME |

## IV.    CONCLUSION

WHEREFORE, Plaintiff Stephanie Speight respectfully requests that the Court enter an Order (i) extending Plaintiff's deadline to designate expert witnesses on issues related to class certification from August 6, 2013 to October 4, 2013, (ii) extending Plaintiff's deadline to move for class certification and serve all information specified by Fed. R. Civ. P. 26(a)(2) from August 20, 2013 to October 18, 2013, (iii) extending Defendant's deadline to designate expert witnesses on issues related to class certification from October 4, 2013 to December 3, 2013, (iv) extending Defendant's deadline to file a response to the motion for class certification and serve all information specified by Fed. R. Civ. P. 26(a)(2) from October 18, 2013 to December 17, 2013, and (v) extending Plaintiff's deadline to file a reply in support of the motion for class certification from November 8, 2013 to January 14, 2014.

Dated: August 5, 2013                                    Respectfully submitted,

                                                         PLAINTIFF STEPHANIE SPEIGHT,


                                                         By:  ____/s/ Steven L. Woodrow_____
                                                               One of Plaintiff's Attorneys

Steven L. Woodrow (No. 43140)
Megan Lindsey (No. 43817)
EDELSON LLC
999 West 18th Street, Suite 3000
Denver, Colorado 80202
Telephone: 303.357.4878
Fax: 303.446.9111
swoodrow@edelson.com
mlindsey@edelson.com

Benjamin H. Richman
EDELSON LLC
350 North LaSalle Street, Suite 1300
Chicago, IL 60654
Telephone: 312.589.6370
brichman@edelson.com

Stefan L. Coleman
LAW OFFICES OF STEFAN COLEMAN, PLLC
1072 Madison Avenue, Suite 1
Lakewood, NJ 08701
Telephone: (877) 333-9427
law@stefancoleman.com

*Attorneys for Plaintiff and the Putative Class*

## CERTIFICATE OF SERVICE

I, Steven L. Woodrow, an attorney, hereby certify that on August 5, 2013, I served the above and foregoing ***Plaintiff's Motion to Extend Deadlines for the Parties to Designate Class Certification Experts and File Papers Related to Class Certification*** by causing a true and accurate copy of such paper to be filed with the Clerk of the Court and transmitted to all counsel of record via the Court's CM/ECF electronic filing system. I further certify that, in accordance with Local Rule 6.1, I caused this motion to be served on Plaintiff Stephanie Speight via email and U.S. mail on August 6, 2013.

   /s/ Steven L. Woodrow