**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:12-cv-02638-CMA-KMT

**STEPHANIE SPEIGHT**, individually and on behalf
of all others similarly situated,

    Plaintiff,

v.

**BANKRATE, INC**., a Delaware corporation,

    Defendant.

---

**PLAINTIFF SPEIGHT'S SECOND MOTION TO COMPEL
BANKRATE TO ANSWER DISCOVERY**

---

**I.     Introduction**

This putative class action challenges Bankrate's calling of consumers without their permission. After five (5) depositions and significant third-party discovery, it is undisputed that Bankrate called thousands of consumers using health and life insurance leads that it obtained from a third-party affiliate known as "Inadco." Inadco, in turn, obtained the leads that it sold to Bankrate from a company called United Quotes, who in turn had purchased many of the leads from the actual source—a website located at URL www.branddealsonline.com (the "Branddeals Website"), run by a company called SubscriberBASE.

It is these specific health and life insurance leads—generated by the Branddeals Website and transmitted from United Quotes to Bankrate's computer system—that are at issue in this case. Any persons, like Plaintiff Speight, whose cellphone numbers appeared in such leads and who Bankrate called through its Warm Transfer Process[1] have claims against Bankrate under the TCPA for being called without providing their consent.

Bankrate's Five9 dialing equipment—the auto-dialer program that it used to place the offending calls—contains all the leads Bankrate called during the operative time period of June 2012 to October 2012. This lead data shows the lead phone number, the

---

[1] Bankrate's Warm Transfer Process lasted from June 2012 to October 2012. This case specifically involves the rights of persons whose Inadco leads were originated via the Branddeals Website who Bankrate called through the Warm Transfer Process.

2

times and dates called (some, like Plaintiff Speight, were called repeatedly), and the name of the affiliate where the leads came from—in this case, Inadco.

On August 6, 2013, Plaintiffs sent an email asking Bankrate to provide materials discussed during the depositions. Included in this list was the data that Bankrate had for the Inadco leads, including the specific databases where the information was being stored and their related fields and schema.

After deferring a response, Bankrate's counsel eventually indicated during a telephonic meet and confer on August 16, 2013 that Bankrate didn't view such information as being relevant or covered by the discovery propounded in the case. Plaintiff's counsel thereafter explained that such data could be used to identify class members. Despite further discussions, counsel were unable to resolve their differences other than to agree they were at issue, thus necessitating the instant motion to compel. For the reasons that follow, this Court should grant Plaintiff's motion.

**II.     Factual Background**

On August 6, 2013, following the depositions of 5 of Bankrate's witnesses, Plaintiff's counsel sent counsel for Bankrate an email seeking, among other items:

> 6. All database schema and fields that Bankrate maintains for the leads it purchased from Inadco. Please indicate whether such schema included populated fields for "Subsource ID" or "Referring URL" or similar field, and
>
> 7. A report generated by querying Bankrate's database(s) that contains its Inadco lead data for all Inadco leads where the "Subsource ID" or "Referring URL" or similar field is populated with www.branddealsonline.com. Include in the report the number of leads Bankrate purchased from Inadco that originated via www.branddealsonline.com.

3

(*See* "Email of Aug. 6, 2013," attached to the Woodrow Declaration as Exhibit 1.)

Following requests for additional time to respond, Bankrate's counsel indicated it was prepared to discuss such items, and counsel held a telephonic meet and confer on August 16, 2013. (*See* Declaration of Steven Woodrow ¶ 4, attached as Exhibit A.) During the meet and confer, counsel for the Defendant indicated that Bankrate did not have any leads identifying the source URL as the Branddeals Website. (Woodrow Decl. ¶ 5.) Rather, the data was limited solely to the leads that came from Inadco which, according to the Bankrate (with some support from statements by Inadco's lawyers) could have come from numerous other, unidentified sources apart from the Branddeals Website. (*Id.*) This is because Inadco (through United Quotes) was apparently selling insurance leads to Bankrate that had originated via the Branddeals Website but also from other sources and websites. (*Id.*)

Plaintiff's counsel indicated that if the "Subsource ID" or "Referring URL" field was absent, Plaintiff still needed to understand, as set forth in the first part of Question 6, the database fields and schema that Bankrate maintained. (*Id.* ¶ 6.) Defense counsel responded that such information was irrelevant and had never been asked for. (*Id.*)

Plaintiff's counsel then explained that the database information, including the fields and schema used, had been requested previously and was directly relevant to ascertainability, numerosity, and manageability. (*Id.* ¶ 7.) Plaintiff's counsel explained that if Bankrate's data showed the telephone numbers called and the source of the leads as being from Inadco—which Bankrate's lawyer refused to confirm during the call—then Plaintiff could use the data to generate a list of all phone numbers called by

4

Bankrate where the lead originated via Inadco. (*Id.*) Armed with such information, Plaintiff Speight could then compare the telephone numbers called to the lead data (to be produced by third-party SubscriberBASE or, potentially, United Quotes) that shows the leads that originated via the Branddeals Website and were sold to United Quotes.[2] (*Id.*) Plaintiff's counsel further described how comparing the phone numbers in such leads to the phone numbers from Bankrate's Inadco list would reveal the phone numbers that Bankrate called using Inadco leads where the lead was originated via the Branddeals Website and sold to United Quotes. (*Id.*) Of the numbers appearing on both lists, those that are cell phone numbers are nearly certain to be members of the class.[3]

Bankrate's attorney responded that "that's not how it works" and asserted that leads could have come into Bankrate and been called through other channels. (*Id.* ¶ 8.) Counsel's remark—made without checking first with his client at all—is not accurate. Bankrate and the other companies involved apply scrubbing practices and other safeguards specifically to ensure that they do not purchase the same leads through multiple sources. Furthermore, time data could be extracted that would help show a

---

[2] As explained in the forthcoming Expert Report of Serge Jorgensen, this could be accomplished in two primary ways. First, Plaintiffs can provide Bankrate with a specific query for the database containing Bankrate's Inadco leads that would search the database for the telephone numbers contained in the Branddeals Website leads. In the alternative, Bankrate could produce the Inadco lead data and Plaintiff and her expert will perform the proper comparison.

[3] As Mr. Jorgensen's anticipated report will describe, the database information could then be run through a third-party service, such as that offered by Intellus, that would reveal whether the numbers correspond to cellphones or landlines.

5

connection between the generation of the lead via the Branddeals Website and Bankrate's calling of the consumer through its Warm Transfer process.[4]

On August 16, 2013, following the telephonic meet and confer, Plaintiff's counsel sent a follow up email to Bankrate's attorneys. Plaintiff's counsel specifically reminded Bankrate's lawyers of Document Requests Nos. 17 and 18, which sought information and data related to Bankrate's leads. Specifically, Request 17 sought:

> All DOCUMENTS RELATING TO how the PHONE CALLS to PLAINTIFF and the PROPOSED BANKRATE CLASS MEMBERS were made, INCLUDING, DOCUMENTS DESCRIBING or IDENTIFYING all TELEPHONE DIALING EQUIPMENT used to make the PHONE CALLS, and how the phone numbers of the PLAINTIFF and the PROPOSED BANKRATE CLASS MEMBERS were inputted, processed, stored, and dialed.

(Woodrow Decl. ¶ 9. *See also* "Email of Aug. 16, 2013," attached to the Woodrow Declaration as Exhibit 2.) The database information plainly relates to how the phone calls were made and how the phone numbers were inputted, stored, and dialed. As a result, the database information is plainly covered by existing requests.

Ultimately, it appears that Bankrate refuses to provide such data and information precisely because it would facilitate the identification of putative class members in a manageable and straightforward way. This Court should see through such tactics. Accordingly, and as set forth more fully below, Plaintiff Speight respectfully requests

---

[4] Accordingly, in addition to the telephone number fields, Bankrate should also be required to produce all data regarding the date the data entries were created. As explained in the forthcoming Expert Report of Serge Jorgensen, this would enable Plaintiff to ascertain whether Bankrate called the Inadco lead shortly after the lead was originated via the Branddeals Website (and any leads called by Bankrate prior to the lead's origination via the Branddeals Website or for a period too far following the origination date would be excluded.)

that the Court compel Bankrate to produce the database schema and fields (along with identifying the specific database(s) implicated) for the Inadco leads that it called using the Five9 dialer during the relevant period of time, together with the full lead information so that the number of class members may be reported to the Court. At a minimum, Bankrate should be compelled to produce such leads in full should the Court certify the proposed Class.

## III.    Argument

"A party responding to discovery has a duty to answer requests for production in a manner that is complete, explicit and responsive." *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 631 (D. Colo. 2007) (citing *Zubulake v. UBS Warburg LLC,* 229 F.R.D. 422, 431 (S.D.N.Y. 2004)). Relevance, as contemplated under the federal rules, is very broad, and it is the burden of the party opposing discovery to establish that the requested discovery does not fall under the scope of relevance as defined in Fed. R. Civ. P 26(b)(1). *Davis v. Delta Chamber of Commerce*, No. 10-CV-02664-WYD-MEH, 2011 WL 1626578 (D. Colo. Apr. 28, 2011) (citing *Simpson v. Univ. of Colo.,* 220 F.R.D. 354, 359 (D. Colo. 2004).

As explained below, Bankrate fails to explain how the requested information could possibly be irrelevant to the facts and issues involved in the case.

**A.      Bankrate should be compelled to produce the data for the Inadco leads that it called—such information is directly relevant to class certification issues of numerosity, ascertainability and manageability.**

Bankrate's Inadco lead data from the Five9 dialer is plainly relevant and should be produced. As explained above, when cross-referenced against the lead data provided by SubscriberBASE for the Braenddeals Website leads that were sold to United Quotes, Plaintiffs will be able to identify all persons who Bankrate called where the leads were originated via www.branddealsonline.com and came to Bankrate through Inadco. Coupled with the "date entry created" or similar data, Plaintiffs will further be able to compare the dates of the leads and ensure that Inadco didn't acquire the lead through a different channel. Plaintiffs can then take this list of phone numbers and run it through a service that determines whether the assigned number is a cellphone or a landline. The final list of cellphone numbers is the list of class members.

Rule 23 requires that Plaintiff prove numerosity, and class action jurisprudence holds generally that, as a corollary, proponents of certification must also demonstrate the existence of an ascertainable class. *See* FED R. CIV. P. 23(a)(1); *see also Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 382 (D. Colo. 1993); *see also Rodriguez v. Bar–S Food Co.,* 567 F. Supp. 1241, 1247 (D.Colo.1983); § 1760A Class Must Exist, 7A Fed. Prac. & Proc. Civ. § 1760 (3d ed.); *see also In re Motor Fuel Temperature Sales Practices Litig.,* 279 F.R.D. 598, 604 (D. Kan. 2012) ("The definition must be precise, objective and presently ascertainable") (citing *In re Urethane Antitrust Litig.,* 237 F.R.D. 440, 444–45 (D.Kan.2006)). Further, in damages class actions such as this case,

Case 1:12-cv-02638-CMA-KMT   Document 54   Filed 08/19/13   USDC Colorado   Page 9 of 12

maintaining the class action must also be appropriate from a manageability standpoint. *See e.g. Shook v. El Paso Cnty.*, 386 F.3d 963, 973 (10th Cir. 2004)

Bankrate's Five9 dialer data speaks directly to each of these issues. Providing the data will enable Plaintiff to demonstrate that there exists an objective, data-driven way to ascertain who is part of the class without forcing the Court or the Parties to become bogged down in individualized or special issues. Rather, class membership (pending a review of the database fields and schema) is to be determined for everyone based on the origination source of the leads (was it the Branddeals Website or not), whether the calls were placed by Bankrate, and whether the calls were to cellphones.

Once Plaintiff can cross-reference the lists and weed out landline numbers, Plaintiff can report an accurate (or nearly accurate) number to the Court for the purposes of satisfying numerosity.

Bankrate's argument that such discovery has not previously been requested is not accurate. As explained above, Plaintiff specifically requested all documents (including ESI) related to Bankrate's storing of Five9 telephone numbers in Document Request No. 17. Accordingly, any such assertion by Bankrate that new discovery should be issued is misplaced.

Likewise, the argument advanced by Bankrate's attorneys that such database information need not be produced because at most the data would "only" show the Inadco leads, not the leads that Bankrate called that originated via the Branddeals Website, falls apart. Bankrate's lawyers ignore the second piece of the puzzle—cross-referencing the lead data against the data to be produced by SubscriberBASE in order

9

to determine which of the Inadco leads that Bankrate called had originated from the Branddeals Website. Bankrate's objection essentially boils down to an assertion that simply because it lacks *complete* information, it shouldn't have to produce *any* information. No rule allows it to conduct itself in discovery in such a manner.

As a result, because the Five9 database information is relevant and will likely reveal a manageable and efficient way (when combined with other data) to ascertain class membership, no basis exists for allowing Bankrate to continue withholding it.

## IV.  CONCLUSION

Plaintiff has requested that Bankrate produce the database schema and associate fields for its Five9 dialer, specifically with respect to the Inadco lead data, together with the Inadco leads. Bankrate has offered unfounded objections, none of which support allowing it to conceal the information. To the contrary, though Bankrate may desire to keep such information hidden—particularly because it provides an efficient and manageable way to ascertain class membership—the information bears directly on certification considerations and should be produced without further obstruction.

WHEREFORE the Plaintiff, Stephanie Speight, on behalf of herself and all others similarly situated, respectfully requests this Honorable Court grant her Second Motion to Compel and enter an order requiring that Defendant Bankrate disclose the database schema and associate fields for its Five9 dialer, specifically with respect to the Inadco lead data. Furthermore, Bankrate should be required to produce all Inadco lead data so that the number of class members may be identified prior to certification. Otherwise, at

the very least Defendant should be required to provide the complete lead information following a decision granting certification so that the actual number of class members and their identities may be reported to the Court.

Date: August 19, 2013

        Respectfully submitted,

        STEPHANIE SPEIGHT

        /s/ Steven L. Woodrow
        One of her attorneys

        Steven L. Woodrow (No. 43140)
        Megan Lindsey (No. 43817)
        EDELSON LLC
        999 West 18th Street, Suite 3000
        Denver, Colorado 80202
        Telephone: 303.357.4878
        Fax: 303.446.9111
        swoodrow@edelson.com
        mlindsey@edelson.com

        Benjamin H. Richman
        EDELSON LLC
        350 North LaSalle Street, Suite 1300
        Chicago, IL 60654
        Telephone: 312.589.6370
        brichman@edelson.com

        Stefan L. Coleman
        LAW OFFICES OF STEFAN COLEMAN, PLLC
        1072 Madison Avenue, Suite 1
        Lakewood, NJ 08701
        Telephone: (877) 333-9427
        law@stefancoleman.com

        *Attorneys for Plaintiff and the Putative Class*

## **CERTIFICATE OF SERVICE**

I, Steven L. Woodrow, an attorney, hereby certify that on August 19, 2013, I served the above and foregoing ***Plaintiff Speight's Second Motion to Compel Bankrate to Answer Discovery*** by causing a true and accurate copy of such paper to be filed with the Clerk of the Court and transmitted to all counsel of record via the Court's CM/ECF electronic filing system.

                                                                                                                    /s/ Steven L. Woodrow