IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:12-cv-2638-CMA-KMT

STEPHANIE SPEIGHT, individually and
on behalf of all others similarly situated,

    Plaintiff,

v.

BANKRATE, INC., a Delaware corporation,

    Defendant.

---

## DEFENDANT BANKRATE, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

---

**TABLE OF CONTENTS**

                                                                        **Page(s)**

I.      INTRODUCTION...................................................................................1

II.     FACTUAL BACKGROUND ....................................................................3

        A.      Bankrate Seeks Only High Quality Leads....................................3

        B.      Bankrate Sells Leads After Acquiring Them................................4

        C.      Bankrate Obtained Plaintiff's Lead from Inadco .........................5

        D.      Consumers Who Submitted Their Numbers via the Branddeals
                Websites Consented to Be Called by Bankrate...........................7

                1.      Privacy Policy and Registration .......................................7

                2.      Terms and Conditions....................................................10

                3.      SOI Questions for United Quotes ...................................10

III.    THE COURT SHOULD DENY PLAINTIFF'S MOTION ......................12

        A.      Plaintiff's Claims Are Not Typical of the Class...........................12

        B.      Because Proposed Class Members Consented to Be Called,
                Plaintiff Cannot Establish Ascertainability, Commonality, or
                Predominance ...........................................................................18

                1.      Plaintiff Has Not Met Her Burden to Show Lack of Consent..........19

                2.      Bankrate Has Demonstrated It Obtained Consent.........................20

                3.      Plaintiff's Proposed Class Is Overbroad ........................................23

                4.      Plaintiff's Proposed Class Is Not Ascertainable ............................25

                5.      Plaintiff Cannot Demonstrate Commonality ....................................27

                6.      Plaintiff Cannot Demonstrate Predominance.................................29

        C.      Plaintiff Has Failed to Demonstrate Numerosity ........................32

        D.      Plaintiff Is Not an Adequate Class Representative .....................33

        E.      A Class Action Is Not Superior ..................................................36

IV.     CONCLUSION ...................................................................................39

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*A PDX Pro Co., Inc. v. DISH Network, LLC*,
  No. 12-cv-1699, 2013 WL 3295639 (D. Colo. July 1, 2013) ....................................24

*A&L Indus., Inc. v. P. Cippollini, Inc.*,
  No. 12-cv-07598, 2013 WL 5503303 (D.N.J. Oct. 2, 2013) ....................................38

*Agne v. Papa John's Int'l, Inc.*,
  286 F.R.D. 559 (W.D. Wash. 2012)....................................................................31, 38

*Armstrong v. Davis*,
  275 F.3d 849 (9th Cir. 2001) ....................................................................................18

*Balbarin v. N. Star*,
  No. 10-cv-1846, 2011 WL 211013 (N.D. Ill. Jan. 21, 2011) ....................................32

*Balthazor v. Cent. Credit Servs., Inc.*,
  No. 10-cv-62435, 2012 WL 6725872 (S.D. Fla. Dec. 27, 2012) ........................27, 30

*Berger v. Compaq Computer Corp.*,
  257 F.3d 475 (5th Cir. 2001) ....................................................................................34

*Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*,
  No. 09-cv-02757, 2012 WL 1378531 (D. Colo. Apr. 20, 2012) ..........................13, 17

*Concrete Contractors, Inc. v. E.B. Roberts Constr. Co.*,
  664 P.2d 722 (Ct. App. Colo. 1982)..........................................................................21

*Connelly v. Hilton Grand Vacations Co., LLC*,
  No. 12-cv-599, 2013 WL 5835414 (S.D. Cal. Oct. 29, 2013)..............................30, 31

*Conrad v. Gen. Motors Acceptance Corp.*,
  283 F.R.D. 326 (N.D. Tex. 2012)..................................................................... passim

*Dubin v. Miller*,
  132 F.R.D. 269 (D. Colo. 1990)................................................................................36

*E. Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*,
  109 P.3d 969 (Colo. 2005) .................................................................................28, 32

*Edwards v. Zenimax Media Inc.*,
  No. 12-cv-00411, 2012 WL 4378219 (D. Colo. Sept. 25, 2012) ..................12, 23, 25

ii

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974) ........................................................................................35

*Fields v. Mobile Messengers Am., Inc.*,
    No. 12-cv-05160, 2013 WL 6073426 (N.D. Cal. Nov. 18, 2013)..............................19

*Fincher v. Prudential Prop. & Cas. Ins. Co.*,
    No. 00-cv-02098, 2007 WL 891371 (D. Colo. Mar. 22, 2007) ..................................15

*Forman v. Data Transfer, Inc.*,
    164 F.R.D. 400 (E.D. Penn. 1995) ..........................................................13, 16, 36, 37

*G.M. Sign, Inc. v. Brink's Mfg. Co.*,
    No. 09-cv-5528, 2011 WL 248511 (N.D. Ill. Jan. 25, 2011).......................................29

*Gannon v. Network Tel. Servs., Inc.*,
    No. 12-cv-9777, 2013 WL 2450199 (C.D. Cal. June 5, 2013) ......................26, 30, 31

*Gen. Tel. Co. Sw. v. Falcon*,
    457 U.S. 147 (1982) ..................................................................................12, 17

*Gene & Gene LLC v. BioPay LLC*,
    541 F.3d 318 (5th Cir. 2008) ......................................................................30

*Grosvenor v. Qwest Corp.*,
    854 F. Supp. 2d 1021 (D. Colo. 2012)........................................................20

*Ibey v. Taco Bell Corp.*,
    No. 12-cv-0583, 2012 WL 2401972 (S.D. Cal. June 18, 2012) ................................22

*Insolia v. Philip Morris Inc.*,
    186 F.R.D. 535 (W.D. Wis. 1998)........................................................13, 16

*Jamison v. First Credit Servs., Inc.*,
    290 F.R.D. 92 (N.D. Ill. 2013) ....................................................23, 30, 31

*Joseph v. Gen. Motors Corp.*,
    109 F.R.D. 635 (D. Colo. 1998) ................................................................16

*Kavu, Inc. v. Omnipak Corp.*,
    246 F.R.D. 642 (W.D. Wash. 2007)......................................................29, 38

*Kelley v. Mid-Am. Racing Stables, Inc.*,
    139 F.R.D. 405 (W.D. Okla. 1990)............................................................34

*Klotz v. Trans Union, LLC*,
    246 F.R.D. 208 (E.D. Penn. 2007) ..............................................14, 17, 34, 37, 39

*Kohn v. Am. Housing Found., Inc.*,
    178 F.R.D. 536 (D. Colo. 1998)................................................................16

iii

*Lane v. Urgitus,*
  145 P.3d 672 (Colo. 2006) .................................................................24

*Livingston v. U.S. Bank, N.A.,*
  58 P.3d 1088 (Ct. App. Colo. 2002)......................................................30

*Local Baking Prods., Inc. v. Kosher Bagel Munch, Inc.,*
  421 N.J. Super. 268 (App. Div. 2011)...............................................37, 38

*Macarz v. Transworld Sys., Inc.,*
  193 F.R.D. 46 (D. Conn. 2000).............................................................38

*Makowski v. First Nat'l of Neb., Inc.,*
  No. 12-cv-2280, 2013 WL 754922 (D. Colo. Feb. 6, 2013) ......................19

*Makowski v. First Nat'l of Neb., Inc.,*
  No. 12-cv-2280, 2013 WL 754779 (D. Colo. Feb. 27, 2013) ....................19

*Manno v. Healthcare Revenue Recovery Grp., LLC,*
  289 F.R.D. 674 (S.D. Fla. 2013) ...........................................................31

*Meyer v. Portfolio Recovery Assocs., LLC,*
  707 F.3d 1036 (9th Cir. 2012) ........................................................19, 31

*Milonas v. Williams,*
  691 F.2d 931 (10th Cir. 1982) ..............................................................17

*Mitchem v. Ill. Collection Serv., Inc.,*
  No. 09-cv-7274, 2010 WL 3003990 (N.D. Ill. July 29, 2010) ...................32

*Monaco v. Bear Sterns Cos., Inc.,*
  No. 09-cv-5438, 2012 WL 10006987 (C.D. Cal. Dec. 10, 2012)..........28, 32

*Newmont U.S.A. v. Ins. Co. of N. Am.,*
  615 F.3d 1268 (10th Cir. 2010) ............................................................21

*Paldo Sign & Display Co. v. Topsail Sportswear, Inc.,*
  No. 08-cv-5959, 2010 WL 4931001 (N.D. Ill. Nov. 29, 2010) ..................29

*People v. Johnson,*
  618 P.2d 262 (Colo. 1980) ..................................................................28

*Pilots Against Illegal Dues (PAID) v. Air Line Pilots Assoc. (ALPA),*
  938 F.2d 1123 (10th Cir. 1991) ............................................................33

*Pinson v. Watkins,*
  No. 06-cv-0323, 2006 WL 1620323 (W.D. Okla. June 7, 2006) ...............35

*Rawat v. Navistar Int'l Corp.*
  No. 08-cv-4305, 2011 WL 222131 (N.D. Ill. Jan. 20, 2011) .....................15

*Rector v. City & Cnty. of Denver,*
  348 F.3d 935 (10th Cir. 2003) ................................................................. 13, 18, 34

*Rex v. Owens,*
  585 F.2d 432 (10th Cir. 1978) ..................................................................... 32

*Rodriguez v. Bar-S Food Co.,*
  567 F. Supp. 1241 (D. Colo. 1983)............................................................... 17

*Rolex Emps. Ret. Trust v. Mentor Graphics Corp.,*
  136 F.R.D. 658 (D. Or. 1991) .................................................................. 34, 35

*Rosales v. FitFlop USA, LLC,*
  No. 11-cv-0973, 2013 WL 3049122 (S.D. Cal. June 17, 2013) ................................ 36

*Ryabyschuck v. Citibank (S.D.) N.A.,*
  No. 11-cv-1236, 2012 WL 5379143 (S.D. Cal. Oct. 30, 2012)............................. 18, 20

*Savanna Grp., Inc. v. Trynex, Inc.,*
  No. 10-cv-7995, 2013 WL 66181 (N.D. Ill. Jan. 4, 2013)....................................... 29

*Schwartz v. Upper Deck Co.,*
  183 F.R.D. 672 (S.D. Cal. 1999) .................................................................. 33

*Sparkle Hill, Inc. v. Interstate Mat Corp.,*
  No. 11-cv-10271, 2012 WL 6589258 (D. Mass. Dec. 18, 2012) .............................. 38

*Stephens v. Gen. Nutrition Cos., Inc.,*
  No. 08-cv-6296, 2010 WL 4930335 (N.D. Ill. Nov. 23, 2010) ................................. 27

*In re Storage Tech. Corp. Sec. Litig.,*
  113 F.R.D. 113 (D. Colo. 1986)................................................................... 35

*Sunbird Air Servs., Inc. v. Beech Aircraft Corp.,*
  No. 89-cv-2181, 1992 WL 193661 (D. Kan. July 15, 1992) ..................................... 34

*Swanson v. Town of Mountain View,*
  No. 06-cv-02272, 2008 WL 786315 (D. Colo. Mar. 20, 2008) ................................ 32

*Swoope v. BellSouth Telecomms., Inc.,*
  Nos. 97-cv-181 and 97-cv-359, 1998 WL 433952 (N.D. Miss. June 23, 1998).........15

*Szabo v. Bridgeport Machs., Inc.,*
  249 F.3d 672 (7th Cir. 2001) ..................................................................... 37

*In re Teflon Prods. Liab. Litig.,*
  254 F.R.D. 354 (S.D. Iowa 2008) .................................................................. 27

*Thrasher-Lyon v. CCS Commercial, LLC,*
  No. 11-cv-04473, 2012 WL 3835089 (N.D. Ill. Sept. 4, 2012) ............................ 18, 20

v

*Travel 100 Grp., Inc. v. Mediterranean Shipping Co. (USA) Inc.,*
383 Ill. App. 3d 149 (Ct. App. Ill. 2008)..........................................................18, 20, 31

*Trevizo v. Adams,*
455 F.3d 1155 (10th Cir. 2006) ...............................................................................32

*Vernon v. Qwest Commc'ns. Int'l, Inc.,*
857 F. Supp. 2d 1135 (D. Colo. 2012).....................................................................20

*Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.,*
274 F.R.D. 229 (S.D. Ill. 2011) .......................................................................... passim

*Wal-Mart Stores, Inc. v. Dukes,*
131 S.Ct. 2541 (2011) .......................................................................................27, 33

*Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.,*
725 F.3d 1213 (10th Cir. 2013) ...............................................................................12

*Watts v. Duane Arnold Energy Ctr.,*
No. 98-cv-0045, 2000 WL 34031503 (N.D. Iowa May 16, 2000)............13, 14, 15, 17

*Wright v. Stone Container Corp.,*
524 F.2d 1058 (8th Cir. 1975) .................................................................................35

*Young v. Dollar Tree Stores, Inc.,*
No. 11-cv-1840, 2012 WL 3704997 (D. Colo. Aug. 24, 2012) ..................................27

*Zinser v. Accufix Research Inst., Inc.,*
253 F.3d 1180 (9th Cir. 2001) .................................................................................37

## STATUTES, RULES, AND REGULATIONS

47 U.S.C. § 227 .................................................................................................. passim

Fed. R. Civ. P. 23 ................................................................................................ passim

47 C.F.R. § 64.1200(a)(3)(ii)(B) ...................................................................................29

LOS ANGELES 1037000

## I.   INTRODUCTION

Defendant Bankrate, Inc. ("Bankrate") provides a service by which it calls consumers who submit requests, via online forms, to be called about health or life insurance quotes. Plaintiff Stephanie Speight ("Plaintiff") alleges she received calls from Bankrate about insurance even though she never requested such calls, and she seeks to represent a class of all persons called by Bankrate whose telephone numbers Bankrate acquired through two websites.[1]  Plaintiff did <u>not</u> visit or submit her telephone number through the Branddeals Websites.  However, every member of Plaintiff's proposed class, except her, consented to be called by Bankrate <u>three separate times</u> in the process of submitting his or her information via the Branddeals Websites.  Plaintiff's class cannot be certified.

The only way proposed class members other than Plaintiff can succeed on their single claim against Bankrate for violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227 *et seq.* ("TCPA") would be to establish that all of the consent language on the Branddeals Websites was somehow insufficient.  Plaintiff, however, does not have standing, or the same interests as proposed class members, to challenge such language because she never visited the Branddeals Websites and is not bound by the terms and agreements contained therein.  Plaintiff cannot establish the requisite element of typicality under Federal Rule of Civil Procedure 23(a).

---

[1] Plaintiff's proposed class definition identifies two websites, www.branddeals**o**nline.com and www.branddealonline.com (collectively, the "Branddeals Websites").  SubscriberBASE, Inc. ("SubscriberBASE") operated www.branddealsonline.com from July 5, 2012, through late September 2012, and www.branddealonline.com from late September 2012 through October 12, 2012.  Declaration of Paul Andrew Spitzer Jr. ("Spitzer Decl"), ¶ 6.

1

Even if the Court finds Plaintiff is typical of the proposed class and can adequately represent their different interests, the class cannot be certified because every consumer who submitted his or her phone number via the Branddeals Websites, during the time period July 5, 2012, through October 12, 2012, consented to be called when he or she: (1) agreed to the websites' Privacy Policy and Terms and Conditions; (2) pressed a "Continue" button directly above language stating that, by selecting such button, the consumer agreed to be called; and (3) specifically asked to "speak to someone" about life and/or health insurance quotes.  Consent is a complete defense to Plaintiff's TCPA claim and, here, Bankrate systematically obtained consent from proposed class members on three separate occasions on the Branddeals Websites.

Neither Plaintiff nor her expert propose any objective criteria to determine who among the proposed class, if anyone, is in her position, and ascertaining that would require mini-trials involving each proposed class member who received a call.  For this same reason, Plaintiff cannot establish commonality or predominance.  No TCPA case has been certified where there exists evidence, such as here, that putative class members provided consent to be called.  Plaintiff premises her entire motion on her argument that Bankrate cannot "demonstrate what consent language was even shown to consumers who visited the Branddeals Websites."  That argument is incorrect.

The Court should also deny the motion because Plaintiff has not shown there is even a single other member of her proposed class.  Nor has she established she can adequately represent the interests of the class when she has delegated all strategic decisions to her lawyers, exhibiting a blind reliance on counsel.  Finally, a class action is

2

not a superior method of resolving the claim of the proposed class. Plaintiff and any member of the class with a meritorious claim could have long ago resolved such a claim in small claims court and recovered at least $500 per alleged TCPA violation.

For the reasons set forth herein, the Court should deny Plaintiff's motion.

## II.    FACTUAL BACKGROUND

Although described in more detail below, this aspect of Bankrate's business at issue in this case is simple -- in response to online requests from consumers who want to purchase health or life insurance, Bankrate connects those "leads" with insurance carriers and agencies to find the most competitive rates. Declaration of Bryan A. Merryman ("Merryman Decl."), ¶¶ 3.a-c, 6.b., Exs. L, O; Declaration of Tricia Winkler ("Winkler Decl."), ¶ 2. Bankrate offered this service between July 5 and October 15, 2012.[2] Mot. at 2 n.3, Dkt. 88 (filed Oct. 18, 2013). Importantly, Bankrate only seeks to call those consumers who want to purchase insurance and consent to be called.

### A.    Bankrate Seeks Only High Quality Leads

Bankrate receives leads in two ways -- directly from consumers who submit a request for an insurance quote through Bankrate's owned and operated websites, and indirectly from a limited number of contracted third parties, known as "affiliates,"[3] who

---

[2] The parties agree the period relevant to this case is July 5 through October 15, 2012. Mot. at 2 n.3. The proposed class consists of individuals Bankrate called because their numbers were submitted through the Branddeals Websites and sold to Bankrate by Inadco. Bankrate called such leads, from telephone number (877) 484-0185, between July 5 and October 15. Bankrate stopped purchasing leads from Inadco on October 12 and made its last call to an Inadco lead on October 15. Winkler Decl., ¶¶ 2-8. Bankrate's practices set forth below, with regards to obtaining, validating, selling and calling leads, were in effect during that time period. *Id.,* ¶ 8.

[3] Here, Bankrate does not use the term "affiliate" in the legal sense, but rather to describe third parties that provide leads to Bankrate. Merryman Decl., ¶ 3.b., Ex. L.

3

operate similar websites. Merryman Decl., ¶¶ 3.c., 3.h., 4.a., 6.a., Exs. L, M, O; Winkler Decl., ¶¶ 2-3. Bankrate's business model depends on finding "high quality" leads, *i.e.*, consumers who "want to have a meaningful conversation with an insurance agent about their insurance needs." Merryman Decl., ¶¶ 3.d., 5.a-b., Exs. L, N.

Seeking to obtain only high quality leads, Bankrate makes substantial efforts to ensure it only contacts those consumers who want, and have consented, to be called, including by checking the content of third party websites and validating lead information. Merryman Decl., ¶¶ 3.e., 4.c., 6.c., Exs. L, M, O. Bankrate's own websites, with URLs such as www.My-Life-Insured.com and www.Life-Insurance-Info.us, display unambiguous consent language. *Id.*, ¶ 3.h. For example, www.NetQuote.com displays language immediately underneath its online form, providing, in part:

> By clicking Get Quotes and seeking a quote request I
> authorize and agree that up to eight insurance companies or
> their agents and NetQuote partners will call me using this
> information to obtain additional information needed to
> provide quotes where permitted by law.

*Id.*, ¶ 3.h., Ex. L (deposition ex. 15, B00063A).

Bankrate takes steps to ensure all leads it acquires from affiliates consent to be called about health or life insurance. Merryman Decl., ¶¶ 3.e., 4.c., Exs. L, M. Among other steps, Bankrate seeks to review affiliate websites to ensure the content relates to insurance, the marketing is consistent with requesting insurance quotes, and the online forms are substantially similar to those used on Bankrate's sites. *Id.*

### B. Bankrate Sells Leads After Acquiring Them

Bankrate sells leads that have requested insurance quotes. Merryman Decl., ¶

4

3.i., Ex. L.  Among other methods, Bankrate calls leads, verifies they remain interested

in insurance, and transfers the leads directly to agents.  Winkler Decl., ¶ 5.  Through this

"Warm Transfer Program," Bankrate obtains additional information relevant to quotes

requested, such as the type of coverage sought and whether it is for an individual or a

family, and, once obtained, connects the lead directly to a customer who desires to sell

insurance to someone who meets the criteria of the consumer on the phone.  *Id.*, ¶ 5;

Merryman Decl., ¶¶ 7.a-b., Ex. P (deposition ex. 66, B00035-39).  Bankrate's Warm

Transfer Program started making calls to life and health insurance leads on July 5,

2012, from telephone number (877) 484-0185.  Winkler Decl., ¶ 8; Mot. at 2 n.3.

### C.    Bankrate Obtained Plaintiff's Lead from Inadco

Through the Warm Transfer Program, Bankrate received a life insurance lead

containing Plaintiff's phone number from an affiliate named Inadco on August 7, 2012.

Winkler Decl., ¶¶ 13-14, Exs. H-J; Merryman Decl., ¶ 8.c., Ex. Q.  Bankrate called

Plaintiff's phone number five times between August 10 and 15, 2012, to provide her with

the life insurance quotes it thought she had requested.  Mot. at 2, 10 n.3.

Inadco sold life and health insurance leads to Bankrate.[4]  Merryman Decl., ¶ 3.g.,

Ex. L (deposition ex. 12, B00050-60).  The Inadco Agreement required Inadco to display

consent language on websites used to acquire leads:

> d.    [Indaco] agree[s] to place and maintain consumer
> language next to the submit button on the application
> submission page on [Inadco]'s web properties in accordance

---

[4] Following Bankrate's acquisition of a company called NetQuote, Bankrate received life and
health insurance leads from Inadco and operated under the terms of NetQuote's agreement with
Inadco, dated November 11, 2008 (the "Inadco Agreement").  Merryman Decl., ¶ 3.g., Ex. L.

5

and compliance with national do not call laws.  Example of
language in compliance with law is outlined below:

> 'By submitting this information, I understand
> that up to eight insurance companies or their
> agents and NetQuote partners subscribing to
> the NetQuote service may contact me via
> email, telephone or fax, using the information I
> have supplied, to provide quotes or to obtain
> information needed to provide quotes.'

Merryman Decl., ¶ 3.g., Ex. L (at B00052).[5]

Unknown to Bankrate until after this litigation began, Inadco did not use its own

websites to acquire leads it sold to Bankrate.  Merryman Decl., ¶ 8.a, Ex. Q.  During the

time period July 5, 2012, through October 12, 2012, Inadco used an entity named

United Quotes to obtain the leads Inadco sold to Bankrate.  *Id.*  Inadco provided United

Quotes with the consent language above from the Inadco Agreement.  *Id.*, ¶ 8.b., Ex. Q.

United Quotes, in turn, obtained leads it sold to Bankrate from several sources,

including SubscriberBASE.  Merryman Decl., ¶ 9.a., Ex. R.  United Quotes told

SubscriberBASE that websites used to solicit leads must display language notifying

consumers that, by submitting their phone numbers, they consented to be called.  *Id.*, ¶

9.b., Ex. R.  Importantly, the two websites relevant to this action -- the Branddeals

Websites -- displayed such consent language.  Spitzer Decl., ¶¶ 14-28, Exs. A-G.  This

is not surprising, as Mr. Van Der Put of United Quotes testified he approved all

---

[5] Bankrate asked Inadco for screenshots of its websites in June 2012.  Merryman Decl., ¶¶ 3.f.,
4.b., Exs. L, M.  The screenshots Inadco provided to Bankrate showed online forms which
included consent language.  language stating: "By submitting this information, I understand that
up to eight insurance companies and their agents and Universal Insurance Quotes partners
subscribing to the Universal Insurance Quotes service may contact me via email, telephone or
fax, using the information I have supplied, to provide quotes or to obtain additional information
needed to provide quotes."  *Id.*, ¶ 8.d., Ex. Q (deposition ex. 100 at B00186-187).

questions used on the Branddeals Websites for United Quotes (consumers asking for life/health insurance quotes) and those questions always included language obtaining consent to be called regarding insurance quotes.  Merryman Decl., ¶ 9.c., Ex. R.

**D.     Consumers Who Submitted Their Numbers via the Branddeals Websites Consented to Be Called by Bankrate**

Between July 5 and October 12, 2012, the Branddeals Websites -- www.branddealsonline.com and later www.branddealonline.com[6] -- displayed language in several places stating that consumers who submitted telephone numbers consented to be contacted at those numbers by, among others, third parties for telemarketing purposes.  Spitzer Decl., ¶¶ 14-28, Exs. A-G.  This language appeared in the "Privacy Policy," on the registration page, and in the form of "simple opt in" ("SOI") questions.  *Id.*

**1.     Privacy Policy and Registration**

From July 5, 2012, through October 12, 2012, the Branddeals Websites directed consumers to the Privacy Policy.  Spitzer Decl., ¶¶ 16-20, 24-26, Exs. A-B, C, E.  The Privacy Policy included provisions explaining how "BrandDealsOnline.com . . . conducts business, what information we collect, how such information is shared with third parties, and your options to control what communications you receive from us and our marketing partners."  Spitzer Decl., ¶ 20, Ex. C.  The Privacy Policy, in a section titled "**YOUR AGREEMENT**," provided:

> By using our website or submitting information to us, you
> consent to our use and sharing of the information collected

---

[6] Although the website URL changed in late September 2012, the content of the Branddeals Websites did not materially change.  Spitzer Decl., ¶ 6; Declaration of J. Jonathan Hawk ("Hawk Decl."), ¶ 2.c., Ex. T.

7

> or submitted as described in this Privacy policy. . . . **This Privacy Policy is incorporated into, and part of, the website Terms & Conditions which govern your use of this website in general. If you do not wish to receive marketing offers and promotions via email, direct mail, SMS text and/or telephone, we ask that you not complete the registration process. You specifically authorize and provide your express consent to receive telemarketing calls from third party marketing partners, including auto-dialed calls, on your landline telephone number and/or your cell phone (if number was provided). . . .**

*Id.* (emphasis in original).

The Privacy Policy provided that the Branddeals Websites collected information from users "for any legally permissible purpose in our sole discretion, including but not limited [to] those explained below," such as "**MARKETING**:"

> With respect to telemarketing in particular, you authorize us and our third-party marketing partners to call your landline telephone and/or cell phone (if provided) . . . .

*Id.* (emphasis in original). The Privacy Policy referred to "marketing partners" as "third parties" with whom SubscriberBASE "share[s], license[s] or sell[s] your information to . . . for various marketing purposes, including . . . offline (e.g., telemarketing, . . .) marketing programs." *Id.* For "telemarketing in particular, [users] authorize us and our third-party marketing partners to call your cell phone (if provided)." *Id.* The Privacy Policy did not specify the names of entities constituting "marketing partners." *Id.*

At the time consumers visiting the Branddeals Websites submitted their phone numbers, they confirmed for a <u>second time</u> their agreement to the terms of the Privacy Policy. Spitzer Decl., ¶¶ 16-26, Exs. A-C, E. Consumers first went through a landing page and clicked on a button titled "CONTINUE," under which appeared:

8

> By entering your email address and continuing, you certify
> that you are US resident over the age of 18 and that <u>you
> agree to the Privacy Policy</u> and Terms and Conditions. You
> agree to receive promotional materials and special offers
> from trusted 3rd parties.

Spitzer Decl., ¶¶ 18-19, Exs. A, B (emphasis added).

After clicking "CONTINUE" on the landing page, consumers landed on a page

with a registration form, asking them to enter information such as name, address and

phone number. Spitzer Decl., ¶¶ 24-25, Ex. E. Directly under the form appeared a

"Continue" button consumers could click to move to the next page. *Id.* Underneath the

"Continue" button appeared language similar to that above, stating consumers clicking

the button agreed, among other things, to the Privacy Policy, and consumers further

consented to be called by third party marketing partners per the Privacy Policy:

> By clicking the Continue button, I have read and agree to
> [branddealsonline.com]'s Privacy Policy and Terms &
> Conditions which includes providing my signature expressly
> requesting a return phone call from the marketing partners
> listed in the Privacy Policy based on my answers to the
> questions following the survey page. I also agree to receive
> Commercial texts.

*Id.* The term "Privacy Policy" in the text above on the landing page and the registration

page was hyperlinked in blue, underlined text, and users who clicked on the hyperlink

went to the Privacy Policy. *Id.*, ¶¶ 18-19, 25, Exs. A, B, E.

In addition to the language below the "Continue" button, there appeared to the

left of the submission form "additional disclosure language" in a "Marketing Disclosures"

provision, listing additional "Marketing Partners" through a hyperlink. Hawk Decl., ¶¶

2.b-c., Ex. T (deposition ex. 9 at B00261). These "Marketing Disclosures" were inserted

9

at the request of specific customers of SubscriberBASE, but did not affect the terms of the Privacy Policy addressing marketing partners more generally.  *Id.*

## 2. Terms and Conditions

By clicking "Continue" buttons on the landing page and the registration page, consumers visiting the Branddeals Websites also agreed to the website's "Terms and Conditions."  Spitzer Decl., ¶¶ 18-20, 24-25, Exs. A-B, D, E.  The Terms and Conditions, which were hyperlinked, contained an arbitration provision:

> **Arbitration:**
> Should a dispute arise concerning the terms and conditions of this Agreement or the breach of same by either party hereto, the parties agree to submit their dispute for resolution by arbitration before the American Arbitration Association in Broward County, Florida, in accordance with the then current Commercial Arbitration Rules of the American Arbitration Association. . . .  This Agreement, together with the Privacy Policy, constitutes the entire agreement between the parties related to the subject matter hereof, and supersedes any prior or contemporaneous (oral, written or electronic) agreement between the parties. To the extent that anything contained in this Agreement contradicts or is in any way inconsistent with the Privacy Policy, the Privacy Policy shall control in all respects.

Spitzer Decl., ¶¶ 20-21, Ex. D.

The above Privacy Policy and the Terms and Conditions provisions remained the same at least through May 2013.  Spitzer Decl., ¶¶ 14-15, 17; Hawk Decl., ¶ 2.b., Ex. T.

## 3. SOI Questions for United Quotes

After clicking "Continue" on the online registration page on the Branddeals Websites, consumers went to a page presenting them with simple opt-in or SOI questions.  Spitzer Decl., ¶¶ 26-28, Exs. E-G.  Each SOI question on that page

LOSANGELES 1037000

presented consumers with a particular offer, and asked a "yes" or "no" question related

to the offer.  *Id.*, ¶ 26.  From July 5 through October 12, 2012, the Branddeals Websites

presented consumers visiting the SOI page with life and health insurance SOI questions

SubscriberBASE displayed specifically for Bankrate, through United Quotes.  Spitzer

Decl., ¶¶ 26-28; Hawk Decl., ¶ 2.a., Ex. T.  Those SOI questions asked consumers

whether they wanted to "<u>speak</u> to someone about" life and/or health insurance:

> Would you like to <u>speak</u> to someone about getting Life
> Insurance for as low as $19 a month?
>
> * * *
>
> Would you like to <u>speak</u> with someone about saving money
> on your Health insurance?

Spitzer Decl., ¶ 27, Exs. F, G (emphasis added).  If a consumer clicked "yes," she would

like to speak with someone, in response to either SOI question, SubscriberBASE

immediately sent the information entered by the consumer on the registration page,

including phone numbers if provided, to United Quotes.  *Id.*; Hawk Decl., ¶ 2.a., Ex. T.

The Privacy Policy explained to consumers what SubscriberBASE did with a

consumer's information if he or she answered "yes" in response to an SOI question:

> **Advertisers**
>
> * * *
>
> When you select "yes" next to an offer, we will transfer some
> or all of the information that you submitted during the
> website registration process to the applicable advertiser
> without providing you with another opportunity to review the
> information.

Spitzer Decl., ¶ 20, Ex. C.  United Quotes had the right to approve or reject final

language used in its SOI questions displayed on the Branddeals Websites, and it never

11

approved language without notice to consumers that they consented to be called about insurance quotes.  Merryman Decl., ¶ 9.c., Ex. R.  SubscriberBASE knew Bankrate was the "end user" of the leads it generated for United Quotes.  Hawk Decl., ¶ 2.d., Ex. T.

On August 4, 2012, a consumer submitted information containing Plaintiff's telephone number and requested to be called regarding life insurance quotes through www.branddealsonline.com.  SubscriberBASE sold that lead to United Quotes.  Winkler Decl., ¶¶ 13-14, Exs. H-J.  Inadco, using United Quotes to obtain leads for it, then sold that same lead with Plaintiff's telephone number to Bankrate on August 7, 2012.  *Id.*

## III.    THE COURT SHOULD DENY PLAINTIFF'S MOTION

A party seeking certification has the burden to demonstrate with evidence, not just allegations, that it satisfies each requirement of Rule 23.  *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213, 1217 (10th Cir. 2013).  Courts must conduct a "rigorous analysis" to decide if class certification is proper.  *Id.*

Plaintiff has the burden to establish the express and implied requirements of Rule 23(a) and at least one condition defined in Rule 23(b).  *XTO Energy, Inc.*, 725 F.3d at 1217-18; *Edwards v. Zenimax Media Inc.*, No. 12-cv-00411, 2012 WL 4378219, at *2-5 (D. Colo. Sept. 25, 2012).  Plaintiff fails to carry her burden.

### A.    Plaintiff's Claims Are Not Typical of the Class

"[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members."  *Gen. Tel. Co. Sw. v. Falcon*, 457 U.S. 147, 156 (1982) (internal quotations omitted).  As Plaintiff admits, "[t]ypicality insures that the class representative's claims resemble the class's claims to an extent

12

that adequate representation can be expected." Mot. at 27 (quoting *Colo. Cross-Disability Coal. v. Abercrombie & Fitch Co.*, No. 09-cv-02757, 2012 WL 1378531, at *4 (D. Colo. Apr. 20, 2012)). "The rationale behind the requirement that the class representative's claims be typical of the class claims is recognition that a plaintiff with claims typical of the class will, in pursuing and defending his own self interest in the litigation, be concomitantly advancing or defending the interests of the class." *Colo. Cross-Disability Coal.*, 2012 WL 1378531, at *4 (internal quotations omitted).

While some factual distinctions between the claims of a named plaintiff and the putative class do not preclude a finding of typicality, "[t]o represent class members effectively, the claims of named plaintiffs must 'have the same essential characteristics as the claims of the class at large.'" *Insolia v. Philip Morris Inc.*, 186 F.R.D. 535, 544 (W.D. Wis. 1998); *Vigus v. S. Ill. Riverboat/Casino Cruises, Inc.*, 274 F.R.D. 229, 236 (S.D. Ill. 2011). "[W]hen a unique defense will consume the merits of a case that [ ] class should not be certified." *Watts v. Duane Arnold Energy Ctr.*, No. 98-cv-0045, 2000 WL 34031503, at *3 (N.D. Iowa May 16, 2000) (internal quotations omitted); *Forman v. Data Transfer, Inc.*, 164 F.R.D. 400, 404 (E.D. Penn. 1995) (in TCPA case, essential consent question was "inherently individualized"). Importantly, where the named plaintiff lacks standing to bring claims or challenge defenses applicable to the class, her claims are not typical of the class. *Rector v. City & Cnty. of Denver*, 348 F.3d 935, 949-50 (10th Cir. 2003); *Watts*, 2000 WL 34031503, at *1.

In *Vigus*, plaintiff alleged defendant casino called his residential phone line in violation of the TCPA. 274 F.R.D. at 232. The casino called plaintiff inadvertently

13

because the phone company assigned plaintiff a number that belonged previously to an individual who provided the number to the casino when signing up for a rewards program. *Id.* The court found plaintiff's claim was not typical of the putative class. *Id.* at 236. Unlike plaintiff, the proposed class included a substantial number of people who "consented to being called on their residential lines when they applied for Total Rewards program membership, and [plaintiff] did not." *Id.*

In *Klotz v. Trans Union, LLC*, plaintiff filed a class action alleging defendant violated the Fair Credit Reporting Act ("FCRA") by declining to investigate disputes. 246 F.R.D. 208, 211-12 (E.D. Penn. 2007). FCRA requires consumer reporting agencies to investigate any dispute submitted "directly" by a consumer. *Id.* at 211. Evidence established the named plaintiff notified defendant of his dispute by mail. *Id.* at 215. For a majority of putative class members, however, a credit repair organization prepared and mailed notice of the dispute. *Id.* Thus, unlike the named plaintiff, putative class members needed to argue for a definition of "directly" that encompassed notice of a dispute sent by a third party. *Id.* The court found the named plaintiff was not typical of his proposed class because the "class members [could not] rely on the plaintiff to propose and prove a definition of 'directly' that [did] not apply to his case, and therefore he [had] not established that he [could] fairly represent their interests." *Id.*

In *Watts*, plaintiff filed a putative class action on behalf of terminated employees. 2008 WL 34031503, at *1. The employer's key defense was all members of the putative class except for the named plaintiff signed a release of claims prior to accepting a severance package. *Id.* Thus, "he [did] not have a similar interest in challenging the

14

validity of the release." *Id.* at *2.  His claims were not typical of the class.  *Id.* at *3; *see also Swoope v. BellSouth Telecomms., Inc.*, Nos. 97-cv-181 and 97-cv-359, 1998 WL 433952, at *2 (N.D. Miss. June 23, 1998) (finding plaintiffs could not establish typicality because, "while most members of the class will probably have to litigate the validity of the releases, the named plaintiffs will not have to do so").

The court in *Watts* also found the named plaintiff did "not have standing to challenge the validity of the pertinent releases." *Watts*, 2000 WL 34031503, at *3. "Because Watts did not sign the release of claims, and defendants have not asserted a release as a defense to his claims, Watts cannot claim he is injured by the pertinent release." *Id.*  The court found "Watts' decision not to sign the release precludes him from now challenging its validity." *Id.*  Similarly, in *Rawat v. Navistar Int'l Corp.*, the court found plaintiffs lacked standing to challenge the validity of releases they did not sign and, therefore, their claims were not typical of the class:

> [T]he named Plaintiffs here do not have standing to challenge an agreement to which they were not a party. . . . Ordinarily, only parties to a contract have standing to challenge its validity.  Obviously, the fact that a third party would be better off if a contract were unenforceable does not give him standing to sue to void the contract.

No. 08-cv-4305, 2011 WL 222131, at *5 (N.D. Ill. Jan. 20, 2011) (internal quotations and citations omitted); *see also Fincher v. Prudential Prop. & Cas. Ins. Co.*, No. 00-cv-02098, 2007 WL 891371, at *3 (D. Colo. Mar. 22, 2007) (finding plaintiff had standing to sue based on a flaw in the insurance policy she purchased, but not those purchased by the putative class: "[c]laims based on these other flaws would differ significantly from Fincher's claim.  These differences indicate that Fincher's claim is not typical of the

15

claims of the broad class of Prudential insureds she seeks to represent.").

Here, as in *Vigus*, Plaintiff received an inadvertent call because someone else submitted her number when requesting a life insurance quote via the Branddeals Websites, leading Bankrate to believe Plaintiff wanted to be called. *Vigus*, 274 F.R.D. at 232. Plaintiff admits she did not submit her number via the Branddeals Websites and ask to be called about insurance quotes. Mot. at 10-12; Merryman Decl., ¶ 2.f., Ex. K. While Plaintiff may have a viable individual claim against Bankrate for a TCPA violation, Bankrate has no liability to members of the putative class. *See Forman*, 164 F.R.D. at 404 ("Proof of plaintiff's [TCPA] claims would not necessarily prove all the proposed class members' claims. Thus, plaintiff's claims are not typical of the class.").

Unlike Plaintiff, the essential characteristic of the claims of putative class members, and the key issue for resolution, is whether they provided consent to receive calls from Bankrate by submitting their phone numbers, asking to be called about life and/or health insurance, and accepting the terms of the Privacy Policy and the Terms and Conditions. *See Forman*, 164 F.R.D. at 404 (in a TCPA case, "the essential question of fact that each potential plaintiff must prove is whether a specific transmission to its machine was without express invitation or permission on its part"); *Vigus*, 274 F.R.D. at 232. That essential issue is irrelevant to Plaintiff's claim.[7] *Insolia*,

---

[7] As Plaintiff's cited authority states, "a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." *Joseph v. Gen. Motors Corp.*, 109 F.R.D. 635, 640 (D. Colo. 1998) (finding factual differences did not create any conflict between plaintiffs and potential class members and "the legal theories [were] common to both plaintiffs and the potential class members"). Cases cited in the motion support that disparity among plaintiffs and putative class members on essential issues defeats typicality. *Compare Kohn v. Am. Housing Found., Inc.*, 178 F.R.D. 536, 541-42 (D. Colo. 1998) (finding individual differences

186 F.R.D. at 544.  Plaintiff does not have the same interest as the putative class in contesting whether acceptance of the Branddeals Websites' contractual consent language constituted prior express consent.  *Klotz*, 246 F.R.D. at 215; *Watts*, 2000 WL 34031503, at *2.  Nor does she share an interest in contesting the arbitration provision. Thus, the interests of the putative class are not fairly encompassed within Plaintiff's claim.  Where, as here, the "individual and class claims might as well . . . [be] tried separately," typicality does not exist.  *Falcon*, 457 U.S. at 159.

Even though Plaintiff never visited the Branddeals Websites and their content is irrelevant to her claim, she spends pages of her motion contesting the terms of the websites.  *See, e.g.,* Mot. at 4-10, 20-25.  Among other issues, she claims screenshots of the Branddeals Websites produced by Bankrate do not reflect the website during the class period and the consent language contained therein was insufficient because the defined term "Marketing Partners" did not include Bankrate.  Mot. at 23-24.  Plaintiff also contests the validity of the arbitration provision in the Terms and Conditions.  Mot. at 29-30.  Bankrate, however, does not assert as a defense to Plaintiff's claim that she consented to be called via the Branddeals Websites or that her claim is subject to

---

as to "integral, indispensable" issues of causation "overwhelm typicality"), *with Milonas v. Williams*, 691 F.2d 931, 938 (10th Cir. 1982) (differences in how students paid for school or the type of behavioral problems each had did not defeat typicality where proposed class members were subject to the same enjoined "behavior-modification" practices by defendant school); *Colo. Cross-Diability Coal.*, 2012 WL 1378531, at *4-5 (variations in merchandise displays at defendant's retail locations did not defeat typicality where named plaintiffs and class members were individuals in wheelchairs who were denied full and equal enjoyment of the stores); *Rodriguez v. Bar-S Food Co.*, 567 F. Supp. 1241, 1247 (D. Colo. 1983) (finding "claims of the named plaintiffs and those of the class members are identical, only the amount of damages suffered by each is different").

LOSANGELES 1037000

arbitration.[8]  Plaintiff lacks standing to challenge the terms of agreements to which she was not a party and consent language both parties admit did not bind Plaintiff.  *Rector*, 348 F.3d at 949-50 ("By definition, class representatives who do not have Article III standing to pursue the class claims fail to meet the typicality requirements of Rule 23").

**B.      Because Proposed Class Members Consented to Be Called, Plaintiff Cannot Establish Ascertainability, Commonality, or Predominance**

A defendant is <u>not</u> liable under the TCPA for making telephone calls if the called party gave his "prior express consent" to receive the calls.  47 U.S.C. § 227(b)(1)(A); *Conrad v. Gen. Motors Acceptance Corp.*, 283 F.R.D. 326, 329 (N.D. Tex. 2012) (finding of consent precludes TCPA liability).  An individual gives prior express consent when he provides a number and agrees to be called at that number.  *See Ryabyschuck v. Citibank (S.D.) N.A.*, No. 11-cv-1236, 2012 WL 5379143, at *2-3 (S.D. Cal. Oct. 30, 2012).  In the context of online agreements, an individual gives consent to be called when he indicates objectively agreement to terms on a website that inform him that he will be called at the number provided.  *Id.* (consent found where plaintiff agreed to online terms contained in pop-up message); *Thrasher-Lyon v. CCS Commercial, LLC*, No. 11-cv-04473, 2012 WL 3835089, at *5 (N.D. Ill. Sept. 4, 2012) (noting an individual expresses consent by "agreeing to terms of service that explicitly permit automated telephone contact"); *see also Travel 100 Grp., Inc. v. Mediterranean Shipping Co.*

---

[8] Plaintiff did not sustain injury as a result of contractual language on the Branddeals Websites. She allegedly sustained injury because someone submitted her number to Bankrate.  Putative class members, on the other hand, only could have sustained injury if the consent language on the Branddeals Websites was ineffective.  The different alleged causes of injury distinguish this case from *Armstrong*.  *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001).

18

*(USA) Inc.*, 383 Ill. App. 3d 149, 154-58 (Ct. App. Ill. 2008) (consent where plaintiff submitted number to database operator and was informed database was distributed to third parties to "market [] products and services [] directly" (emphasis omitted)).

### 1.   Plaintiff Has Not Met Her Burden to Show Lack of Consent

Plaintiff's failure to produce evidence of proposed class members' <u>lack of consent</u> warrants denial of her motion.  This Court recently noted a plaintiff must show defendant did not have consent to establish a *prima facie* TCPA case.  *Makowski v. First Nat'l of Neb., Inc.*, No. 12-cv-2280, 2013 WL 754922, at *7 (D. Colo. Feb. 6, 2013), *adopted* 2013 WL 754779 (Feb. 27, 2013).  The Ninth Circuit applies the same standard and one court, following the standard, reasoned, because lack of consent is an element of a *prima facie* TCPA case, a plaintiff has the burden under Rule 23 to offer proof of that element at the certification stage.  *See Fields v. Mobile Messengers Am., Inc.*, No. 12-cv-05160, 2013 WL 6073426, at *3-4 (N.D. Cal. Nov. 18, 2013) (citing *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1042 (9th Cir. 2012)).

This issue is unsettled in this Circuit, but the court's reasoning in *Fields* is persuasive and should be adopted.  Plaintiff does not carry her burden.  Indeed, Plaintiff's only evidence on the issue of prior express consent is she personally never consented to receive calls from Bankrate.  Mot. at 36.  As to the putative class, Plaintiff merely argues Bankrate "cannot produce screenshots of the Branddeals Websites during the relevant period of time." *Id.*  That is not evidence; it is merely a notation of the absence of evidence (which is incorrect).

19

## 2.   Bankrate Has Demonstrated It Obtained Consent

Even assuming Bankrate has the burden to show proof of consent at the class certification stage (which it does not concede), Bankrate has shown consumers visiting the Branddeals Websites systematically provided consent to be called three times by: (1) agreeing to the terms of the Privacy Policy;[9] (2) clicking "yes" in response to an SOI question asking whether the consumer "Would like to speak with someone" about life or health insurance; and (3) clicking "continue" and "specifically authorizing and providing express consent to receive telemarketing calls from third party marketing partners, including auto-dialed calls on . . . your phone."[10]  Spitzer Decl., ¶¶ 14-28, Exs. A-G.

The evidence also demonstrates Bankrate required Inadco to obtain consent from leads it sold to Bankrate.  Merryman Decl., ¶ 3.g., Ex. L (deposition ex. 12 at B00052).  Inadco informed United Quotes of that consent requirement.  *Id.*, ¶ 8.b., Ex. Q.  United Quotes worked with SubscriberBASE to ensure its websites contained language conclusively giving consent to United Quotes and anyone who purchased a lead generated by SubscriberBASE to call that consumer regarding insurance quotes. *Id.*, ¶¶ 9.b-c., Ex. R.  Screenshots show the consent language on the Branddeals

---

[9] "An objective manifestation of assent is not rebutted by that same party's uncommunicated subjective intent," and "one generally cannot avoid contractual obligations by claiming that he or she did not read the agreement."  *See Vernon v. Qwest Commc'ns. Int'l, Inc.*, 857 F. Supp. 2d 1135, 1049-51 (D. Colo. 2012).  Even if users of the Branddeals Websites did not read the Privacy Policy, they agreed to its terms when they clicked the "submit" buttons.  *Id.* (applying Colorado law to find such "modified clickwrap" agreements enforceable); *Grosvenor v. Qwest Corp.*, 854 F. Supp. 2d 1021, 1026, 1028-29 (D. Colo. 2012) (same).

[10] *See Thrasher-Lyon*, 2012 WL 3835089, at *5; *Ryabyshchuck*, 2012 WL 5379143, at *2-3; *Travel 100*, 383 Ill. App. 3d at 154-58.

Websites during the time period relevant here.[11]  Spitzer Decl., ¶¶ 14-28, Exs. A-G.

Plaintiff's only theory regarding lack of consent relies blindly on a single provision titled "Marketing Disclosures," found on the registration page seen by consumers, to the exclusion of the rest of the Branddeals Websites.  Based on this one provision, Plaintiff contends putative class members only consented to be called by a list of entities found after a hyperlink titled "Marketing Partners" that did not include Bankrate.  Mot. at 21-23. This theory ignores the Privacy Policy and the SOI questions.

Nothing in the Marketing Disclosures provision provides that those entities falling within the defined term "Marketing Partners" are the only entities from whom putative class members consented to receive calls.  The Privacy Policy identifies another, broader group of undefined "marketing partners" who obtained consent as well.  *See, supra,* Sec. II.D.1.  SubscriberBASE added the "Marketing Disclosures" provision, with the defined term "Marketing Partners," because certain customers requested it. Hawk Decl., ¶ 2.b., Ex. T.  There is no evidence the addition of that defined term had any relevance to the TCPA and, to the extent it impacted consent from consumers, the provision provided specified consent to a specific list of SubscriberBASE customers in addition to, not to the exclusion of, the consent to be called provided three separate

---

[11] SubscriberBASE knew Bankrate was an end user of the leads, and United Quotes told SubscriberBASE that its buyers needed consent to call leads.  Hawk Decl., ¶ 2.d., Ex. T.  It should be of no import that "advertiser" and "marketing partner" are not more specifically defined in the Privacy Policy because Bankrate, as the known user of leads and in need of consent to call the leads, was clearly intended to benefit from, and able to rely on, the consent provisions. *See generally Concrete Contractors, Inc. v. E.B. Roberts Constr. Co.*, 664 P.2d 722, 724-25 (Ct. App. Colo. 1982), *aff'd*, 704 P.2d 859 (Colo. 1985); *Newmont U.S.A. v. Ins. Co. of N. Am.*, 615 F.3d 1268, 1273 n.3 (10th Cir. 2010) (noting Colorado law provides "[t]he intent to benefit a third party need not be expressly referred to in the agreement, but must be apparent from the terms of the agreement or the surrounding circumstances") (quotations omitted).

times through the Privacy Policy and the SOI questions.

Irrespective of the provisions regarding "Marketing Partners" and "marketing partners" on the Branddeals Websites, the SOI questions by themselves gave Bankrate consent to call.  By answering "yes" to an SOI question, a user of the website, through SubscriberBASE, initiated contact with Bankrate, gave Bankrate his or her number, and asked to "speak" to someone about insurance quotes.  It is common sense that giving someone your number and asking to "speak" with them gives Bankrate consent to call that consumer.  *See Ibey v. Taco Bell Corp.*, No. 12-cv-0583, 2012 WL 2401972, at *3 (S.D. Cal. June 18, 2012) (consent where plaintiff initiated contact).

Indeed, unrefuted testimony shows United Quotes insisted its SOI questions always include consent language, and only approved SOI questions that did include it. Merryman Decl., ¶¶ 9.b-c., Ex. R.  Consistent with that testimony, SOI questions run for United Quotes contained consent language during the entire month of July 2012, and "likely thereafter."  Spitzer Decl., ¶ 27, Exs. F-G.  The only evidence of SOI questions run for United Quotes on the Branddeals Websites between July 5, 2012, and October 12, 2012, is that those SOI questions <u>always</u> contained consent language.  Merryman Decl., ¶¶ 9.b-c., Ex. R; Spitzer Decl., ¶ 27, Exs. F-G.  Any consumers who selected "yes" to those SOI questions during July 5 through October 12, 2012, therefore, were shown the consent language and asked to be called regarding an insurance quote.

Finally, Plaintiff's motion makes much of Bankrate relying on consent language provided to it by Inadco, which apparently did not appear on the Branddeals Websites, and not knowing SubscriberBASE generated leads it purchased from Inadco.  *See, e.g.,*

Mot. at 1.  Whether Bankrate knew the exact consent language appearing on the Branddeals Websites or the source of certain leads is irrelevant.  As Plaintiff admits, the TCPA is a "'strict liability statute' that 'does not require intent.'"  Mot. at 25.  In determining liability under the TCPA, the issue is whether the called party gave consent.  Here, every consumer called by Bankrate, who submitted his or her phone number through the Branddeals Websites, consented to be called to discuss insurance quotes.

### 3.  Plaintiff's Proposed Class Is Overbroad

Courts deny certification of overbroad classes.  *Edwards*, 2012 WL 4378219, at *5.  Plaintiff's proposed class includes consumers who visited the Branddeals Websites, provided phone numbers through those websites, and consented to be called under the terms of the Privacy Policy and the SOI questions.  *Id.*; *see* Spitzer Decl., ¶¶ 16-28, Exs. A-G.  Even Plaintiff acknowledges her proposed class definition includes consumers who visited the Branddeals Websites and, thus, gave consent to be called.  *See* Mot. at 29 ("its exceedingly unlikely that of 45,000 [purchased Inadco leads] Speight is the only person that Bankrate called who did not personally visit the website"); Spitzer Decl., ¶¶ 16-28, Exs. A-G.  Such individuals do not have a TCPA claim as a matter of law and cannot be a part of the proposed class.  *Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 108-09 (N.D. Ill. 2013); *Conrad*, 283 F.R.D. at 329-30; *Vigus*, 274 F.R.D. at 233-38.

Most tellingly, Plaintiff essentially admits her class survives only if literally none of the putative class members consented to receive telephone calls from Bankrate.  *See* Mot. at 29 ("[w]hether the Branddeals Websites obtained valid prior express consent from <u>any</u> person to be called is a common issue . . . none of the purported consent it

23

secured is valid"). The evidence, however, demonstrates this is not the case.

Plaintiff's class is also overbroad because all proposed members other than Plaintiff agreed to arbitrate disputes with Bankrate, and cannot be a part of the proposed class. The Privacy Policy and Terms and Conditions "together" constituted the agreement governing users of the Branddeals Websites who released telephone numbers. Spitzer Decl., ¶ 21, Ex. D. Bankrate was an intended third party beneficiary of that agreement. *A PDX Pro Co., Inc. v. DISH Network, LLC*, No. 12-cv-1699, 2013 WL 3295639, at *5 (D. Colo. July 1, 2013) (third-party beneficiary status determined based on terms of agreement and surrounding circumstances).

The agreement goes to great lengths to make clear SubscriberBASE collected information from consumers visiting the Branddeals Websites and, by releasing their telephone numbers, they <u>specifically asked</u> to be contacted directly by unknown third parties, including advertisers and telemarketers. Spitzer Decl., ¶¶ 20-21, Exs. C, D); Merryman Decl., ¶ 9.b-c., Ex. R. The terms of the agreement and circumstances surrounding consumer interactions with the Branddeals Websites demonstrate the terms of the agreement were to benefit third parties, as end users of the leads, as much as they were to benefit SubscriberBASE. *See Lane v. Urgitus*, 145 P.3d 672, 683-84 (Colo. 2006) (Eid, J., concurring) ("It is not necessary that the third party be specifically referred to in the agreement. It is sufficient if the claimant is a member of the limited class that was intended to benefit from the contract" (internal quotations omitted)).

The arbitration provision here broadly covers disputes "concerning the terms and conditions of this agreement," including the consent provisions discussed herein, and

24

SubscriberBASE <u>knew</u> Bankrate was an end user of its leads and a beneficiary of those consent provisions.  Hawk Decl., ¶ 2.d., Ex. T.  Bankrate, as a clear beneficiary of the terms of the agreement and recipient of the leads from the Branddeals Websites, should likewise benefit from the arbitration provision.  To that extent, members of Plaintiff's proposed class agreed to arbitrate and are not proper class members.

### 4. Plaintiff's Proposed Class Is Not Ascertainable

A class is sufficiently defined if it is "administratively feasible for the court to determine whether a particular individual is a member" based on objective criteria and without reference to the merits of the case.  *Edwards*, 2012 WL 4378219, at *4 (internal quotations omitted).  Plaintiff's proposed class -- all individuals called by Bankrate as a result of leads obtained from the Branddeals Websites -- is not ascertainable.

Plaintiff's expert admits, without knowing the date each consumer submitted his or her phone number to the Branddeals Websites, he cannot ascertain with certainty which calls Bankrate made based on an Inadco lead generated by the Branddeals Websites.  Merryman Decl., ¶¶ 10.a-g., Ex. S.  The only task Plaintiff asked her expert to perform was to opine whether he could compare two sets of data and compile "a list of phone numbers that match," and he concluded he could accomplish that irrelevant task.  *Id.*, ¶ 10.d., Ex. S.  Plaintiff's expert then honestly conceded "but there's no way with the data that I currently have of linking a number called to that campaign...."  *Id.* He further admits the date each consumer submitted his or her phone number on the Branddeals Websites "would help with the analysis."  *Id.*, ¶¶ 10.d-e., Ex. S.  But the data Plaintiff's expert needs does not exist.  Plaintiff obtained data from SubscriberBASE that

included over one million leads it sent to United Quotes, but that data does not include the date it generated each lead. Without that date, as Plaintiff's expert admits, the lead cannot be matched to the phone numbers Bankrate called because Bankrate may have obtained that phone number from another source. *Id.*, ¶¶ 7.e., 10.a-e., Exs. P, S.

Plaintiff's expert also admits his method for determining which telephone numbers are cell phones is only 75% to 80% accurate. *Id.*, ¶¶ 10.f-g., Ex. S. Even if Plaintiff's expert could discern numbers Bankrate called because they came through the Branddeals Websites between July 5 and October 12, 2012 (which he cannot), his list would not reliably identify specific members of Plaintiff's proposed class. *Id.*

In any event, to ascertain a class who may have a TCPA claim, Plaintiff must set forth objective criteria to identify individuals like her who purportedly received a call from Bankrate because someone else submitted a phone number via the Branddeals Websites. *See Vigus*, 274 F.R.D. at 235-36. Absent individually examining data for each person Bankrate called as a result of a lead initiated from the Branddeals Websites, there is simply no way to objectively identify anyone else in Plaintiff's position. *See Id.*; *see also Gannon v. Network Tel. Servs., Inc.*, No. 12-cv-9777, 2013 WL 2450199, at *2-3 (C.D. Cal. June 5, 2013). A class cannot be certified when ascertaining class membership would require the court to conduct a mini-trial for each putative class member. *Gannon*, 2013 WL 2450199, at *2-3.

Even if the court were inclined to individually examine each proposed class member, class membership should not be ascertained based on individual memories as to whether, more than a year ago, they visited a website and submitted their phone

26

number.  *See, e.g., In re Teflon Prods. Liab. Litig.*, 254 F.R.D. 354, 363 (S.D. Iowa

2008), *petition for appeal denied*, No. 08-8023, *Order* (8th Cir. Mar. 10, 2009) (holding

"[t]he fact that the vast majority of plaintiffs must rely on memory to establish crucial

facts will prevent the parties and the Court from ever being able to establish

membership with objective certainty"); *Stephens v. Gen. Nutrition Cos., Inc.*, No. 08-cv-

6296, 2010 WL 4930335, at *2 (N.D. Ill. Nov. 23, 2010) (denying class certification

where "the Court would be forced to rely on the memory of each class member and their

otherwise unsupported assertions to determine" class membership).

### 5.  Plaintiff Cannot Demonstrate Commonality

Plaintiff must demonstrate proof offered in support of her individual claim will also

prove claims asserted on behalf of alleged class members.  *Wal-Mart Stores, Inc. v.

Dukes*, 131 S.Ct. 2541, 2551 (2011); *see Young v. Dollar Tree Stores, Inc.*, No. 11-cv-

1840, 2012 WL 3704997, at *3 (D. Colo. Aug. 24, 2012).  "What matters to class

certification is not the raising of common 'questions' -- even in droves -- but, rather the

capacity of a classwide proceeding to generate common <u>answers apt to drive the</u>

<u>resolution of the litigation</u>."  *Dukes*, 131 S.Ct. at 2551 (emphasis added).

Consent is a dispositive issue driving a liability determination in a TCPA action,

and is an inherently individualized question preventing commonality.  *Balthazor v. Cent.

Credit Servs., Inc.*, No. 10-cv-62435, 2012 WL 6725872, at *3-5 (S.D. Fla. Dec. 27,

2012).  Plaintiff posits four "common questions" here.  Mot. at 17-27.  But Plaintiff fails to

explain how any of those questions are both "apt to drive the resolution of the litigation"

and subject to common proof.  Whether Bankrate used an ATDS and whether damages

can be trebled are <u>not</u> going to drive resolution of this case.  Prior express consent will, but that issue, which is determinative of three of four "common questions" (nos. 1, 3 and 4: liability, consent, and knowing or willful violation), is not subject to common proof. The evidence shows putative class members gave prior express consent to be called regarding insurance quotes, and Plaintiff does not offer a viable theory as to how the consent issue can be answered with common proof.  Spitzer Decl., ¶¶ 16-28, Exs. A-G.

Indeed, Plaintiff's only attempt to contest evidence of consent is her assertion that the term "Marketing Disclosures" should be read to the exclusion of other provisions on the Branddeals Websites.  Even assuming the "Marketing Disclosures" provision could be read as exclusive (and it cannot), it would create a conflict with the "marketing partners" provision in the Privacy Policy and, thus, ambiguity in the contract governing users of the Branddeals Websites.  *See generally E. Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974-75 (Colo. 2005); *People v. Johnson*, 618 P.2d 262, 266 (Colo. 1980).  This ambiguity and the need to resolve it through extrinsic evidence on a case-by-case basis, including determining each class member's understanding of the agreement, would be inherently individualized and would prevent commonality.  *Monaco v. Bear Stearns Cos., Inc.*, No. 09-cv-5438, 2012 WL 10006987, at *6-10 (C.D. Cal. Dec. 10, 2012) (denying class certification where ambiguous contract would have required extrinsic evidence of intent of proposed class members).

The issue of what each proposed class member understood would be even more complicated because users of the Branddeals Websites agreed to the Privacy Policy on the landing page, <u>before</u> even reaching the registration page which displayed the

28

purportedly conflicting "Marketing Partners" language.  Spitzer Decl., ¶¶ 16-18, Exs. A,

B.  Each proposed class member would need to admit extrinsic evidence of what he or

she looked at on each page and in what order, what the user clicked, and what the user

thought the foregoing provisions regarding "Marketing Partners" and "marketing

partners" meant.  This would surely devolve into a series of mini-trials.

None of Plaintiff's authorities establishes commonality.  Plaintiff's authorities deal

with circumstances where either defendants violated a federal regulation <u>specific to</u>

<u>purchasing lists of fax numbers</u> that required defendants to "take reasonable steps to

verify" individuals on the list "agreed to make the number available for public

dissolution," Mot. at 20 (citing *Paldo Sign & Display Co. v. Topsail Sportswear, Inc.*, No.

08-cv-5959, 2010 WL 4931001, at *2 (N.D. Ill. Nov. 29, 2010) (citing 47 C.F.R. §

64.1200(a)(3)(ii)(B)), and *Kavu, Inc. v. Omnipak Corp.*, 246 F.R.D. 642, 647 (W.D.

Wash. 2007)), or defendants did not submit any evidence they obtained prior express

consent from proposed class members.  *See* Mot. at 25 (citing *Savanna Grp., Inc. v.*

*Trynex, Inc.*, No. 10-cv-7995, 2013 WL 66181 (N.D. Ill. Jan. 4, 2013), and *G.M. Sign,*

*Inc. v. Brink's Mfg. Co.*, No. 09-cv-5528, 2011 WL 248511 (N.D. Ill. Jan. 25, 2011)).

### 6. Plaintiff Cannot Demonstrate Predominance

For a class to be certified, "questions of law or fact common to class members

predominate over any questions affecting only individual members."  Fed. R. Civ. P.

23(b)(3).  The court "must identify the substantive issues that will control the outcome,

assess which issues will predominate, and then determine whether the issues are

common to the class -- a process that prevents the class from degenerating into a

29

series of mini-trials." *Conrad*, 283 F.R.D. at 329; *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 327-29 (5th Cir. 2008) (denying certification of TCPA action where consent issues predominated).   Plaintiff bears the burden to demonstrate common issues predominate and to "advance a viable theory employing generalized proof to establish liability with respect to the class involved." Fed. R. Civ. P. 23(b); *Connelly v. Hilton Grand Vacations Co., LLC*, No. 12-cv-599, 2013 WL 5835414, at *2, 5 (S.D. Cal. Oct. 29, 2013); *Balthazor*, 2012 WL 6725872, at *3-4.

Plaintiff does not meet her burden.  Mot. at 35-37.  Whether Bankrate obtained prior express consent to call proposed class members is a predominating individualized issue.  Indeed, courts consistently deny certification of TCPA actions when defendants operating calling campaigns submit evidence they systematically obtained prior express consent prior to making calls, even if named plaintiffs received calls without consenting. *Jamison*, 290 F.R.D. at 106-08.  Absent named plaintiffs offering any viable theory employing generalized proof to establish which proposed class members did not consent, individualized issues of consent will predominate and class certification is inappropriate. *Id.*; *Vigus*, 274 F.R.D. at 329-30; *Gannon*, 2013 WL 2450199, at *3-4; *see generally Livingston v. U.S. Bank, N.A.*, 58 P.3d 1088, 1091 (Ct. App. Colo. 2002) (denying certification in TCPA action because consent issues predominated).

In *Vigus*, plaintiff received a call from defendant because the prior owner of his phone number signed up for defendant's rewards program and consented to be called. *Vigus*, 274 F.R.D. at 237-38.  In light of evidence of defendant's regular practice of obtaining consent, the court determined defendant's alleged wrongful act was its

30

"irregular conduct of directing those calls to certain individuals that might have been protected from those calls by the TCPA" because they never consented to be called. *Id.* (emphasis omitted). "Determining which specific calls were made to those protected individuals will be the predominant issue in this litigation, and [plaintiff] has not presented an accurate way to answer the individual questions presented by this case on a class-wide basis." *Id.* at 238. The *Vigus* court denied certification.

The same is true here. Determining which calls Bankrate made to individuals, like Plaintiff, who did not visit the Branddeals Websites and consent to be called will predominate this litigation and require the Court to conduct a mini-trial of each proposed member. This litigation would be unmanageable. *See Connelly*, 2013 WL 5835414, at *3-4; *Gannon*, 2013 WL 2450199, at *3-4; *Jamison*, 290 F.R.D. at 105-108; *Vigus*, 274 F.R.D. at 236-38; *Conrad*, 283 F.R.D. at 328-29; *Travel 100*, 383 Ill. App. 3d at 154-59.

All five cases cited by Plaintiff in support of her predominance argument are inapposite. Most do not address TCPA cases where defendants had evidence of consent from a significant portion of the putative class. *Meyer*, 707 F.3d at 1042 (defendant "did not show a single instance where express consent was given before the call was placed"); *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 567 (W.D. Wash. 2012) ("speculation that customers may have given their express consent to receive [calls] is not sufficient to defeat class certification"); *Manno v. Healthcare Revenue Recovery Grp., LLC,* 289 F.R.D. 674, 689 (S.D. Fla. 2013) (persons "who may have been subject to an individualized consent defense were excluded during numerosity discovery"); *Balbarin v. N. Star*, No. 10-cv-1846, 2011 WL 211013, at *1 (N.D. Ill. Jan.

31

21, 2011) (defendant cited only a "single instance" of consent among proposed class); *Mitchem v. Ill. Collection Serv., Inc.*, No. 09-cv-7274, 2010 WL 3003990, at \*1-5 (N.D. Ill. July 29, 2010) (no discussion of whether defendant had evidence of consent).

Further, Plaintiff's (incorrect) claim that provisions on the Branddeals Websites dealing with "Marketing Partners" and "marketing partners" conflict (Mot. at 21-24) only creates another individualized inquiry that will predominate, *i.e.,* each proposed class member's individual understanding of the agreement terms.  *See E. Ridge of Fort Collins, LLC*, 109 P.3d at 974-75; *Bear Stearns Cos., Inc.*, 2012 WL 10006987, at \*6-10.

## C.    Plaintiff Has Failed to Demonstrate Numerosity

Plaintiff must prove the class is so numerous that joinder of all members is impracticable.  Fed. R. Civ. P. 23(a)(1).  A bare allegation of numerosity is insufficient. *Rex v. Owens*, 585 F.2d 432, 436 (10th Cir. 1978); *Swanson v. Town of Mountain View*, No. 06-cv-02272, 2008 WL 786315, at \*2 (D. Colo. Mar. 20, 2008).  Plaintiff fails to meet her burden.  *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006).

First, there is no evidence of anyone else similarly situated to Plaintiff.  *See, supra,* Section III.B.1*; see also Swanson*, 2008 WL 786315, at \*2 (numerosity not met because plaintiff failed to show more than seven putative class members); *Conrad*, 283 F.R.D. at 329 (numerosity not met because plaintiff failed to show more than two putative class members).  Here, Plaintiff represents a class of one.

Second, Plaintiff cannot establish numerosity based on misinterpretation of a document produced by Bankrate.  Mot. at 15.  That document, B00299, shows only the number of leads Bankrate accepted/rejected from Inadco.  Merryman Decl., ¶ 6.d., Ex.

32

O (deposition ex. 58).[12] It does not show how many leads Bankrate called, much less how many calls Bankrate made to cell phone numbers submitted via the Branddeals Websites by individuals who did not consent to be called about insurance quotes.[13] Id.

Finally, Plaintiff cannot establish numerosity based on the "do not call list" produced by Bankrate. Mot. at 16 n.16. This list merely reflects disposition codes assigned by call center representatives to consumers who, for any one of several reasons, asked not to be called, e.g., they initially consented but later, by the time Bankrate called, had already purchased insurance or changed their mind. Winkler Decl., ¶¶ 6-7. Such consumers would not have a TCPA claim. Plaintiff does not submit evidence to show the list is, in fact, a list of consumers who did not consent to be called.

### D.   Plaintiff Is Not an Adequate Class Representative

For at least four reasons, Plaintiff does not meet her burden to prove she will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4); Pilots Against Illegal Dues (PAID) v. Air Line Pilots Assoc. (ALPA), 938 F.2d 1123, 1134 (10th Cir. 1991). First, as discussed above, Plaintiff lacks standing and has no incentive to contest consent or arbitration language contained on the Branddeals Websites because

---

[12] Plaintiff represents incorrectly that B00299 shows the number of Inadco leads Bankrate "called . . . during the relevant time period." Mot. at 15. To the contrary, B00299 shows only how many leads Bankrate received from Inadco from June through October 2012, not how many Inadco leads Bankrate called. Merryman Decl., ¶ 6.d., Ex. O.

[13] Contrary to Plaintiff's motion, Mr. Jorgensen's report does not state how the "precise number of Class members can be determined by comparing the SubscriberBASE data with Bankrate's data." See Mot. at 15. In fact, at his deposition, Mr. Jorgensen admitted that all he did was opine he could match telephone numbers in two data sets. Merryman Decl., ¶ 10.d., Ex. S. He further admitted that he could not with certainty identify which numbers Bankrate called were Inadco leads that came from the Branddeals Websites. Id., ¶ 10.c., Ex. S; see Schwartz v. Upper Deck Co., 183 F.R.D. 672, 681-82 (S.D. Cal. 1999) (mere speculation numerous class members exist is insufficient to satisfy numerosity requirement).

33

she can recover on her claim without showing such language was ineffective.  Plaintiff cannot adequately represent the interests of proposed class members she does not share.  *Rector*, 348 F.3d at 949-50; *Klotz*, 246 F.R.D. at 215-16.

Second, Plaintiff cannot show she "possess[es] a sufficient level of knowledge and understanding to be capable of 'controlling' . . . the litigation." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 482-83 (5th Cir. 2001); *Rolex Emps. Ret. Trust v. Mentor Graphics Corp.*, 136 F.R.D. 658, 665-66 (D. Or. 1991).  A class representative must be in a position to "check the otherwise unfettered discretion of counsel in prosecuting the suit" with respect to facts of the case and economic consequences of the suit.  *Rolex*, 136 F.R.D. at 666.  Among other shortcomings, Plaintiff does not know if she is pursuing this case alone or with other plaintiffs, what documents have been filed, or whether she could have filed her claim on an individual basis.  Merryman Decl., ¶¶ 2.a-b., g., Ex. K.  Plaintiff did not see or discuss the complaint with her attorneys before they filed it.  *Id.* at ¶ 2.h., Ex. K.  Plaintiff, at the time her attorneys filed the complaint, did not understand her role in this putative class action.  *Id.* at ¶ 2.c., Ex. K.

Plaintiff clearly has no desire to control this action for the interests of the putative class.  In fact, Plaintiff admitted she delegated all strategic decisions to her lawyers, exhibiting a blind reliance on counsel.  Merryman Decl.,  ¶ 2.d., Ex. K; *see Sunbird Air Servs., Inc. v. Beech Aircraft Corp.*, No. 89-cv-2181, 1992 WL 193661, at *4 (D. Kan. July 15, 1992) (class representative inadequate where counsel directing case); *Kelley v. Mid-Am. Racing Stables, Inc.*, 139 F.R.D. 405, 409-11 (W.D. Okla. 1990) (same where "plaintiffs [had] abdicated their role to their attorneys, who [became] the *de facto*

34

plaintiffs"); *In re Storage Tech. Corp. Sec. Litig.*, 113 F.R.D. 113, 118-19 (D. Colo. 1986) (class representative inadequate because he did "not appear to be exercising independent judgment"; "class [was] entitled to more than blind reliance on counsel").

Third, Plaintiff cannot adequately protect the interests of the putative class because she is unable or unwilling to provide adequate funds to maintain a class action. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178-79 (1974) (dismissing action where representative would not bear cost of notice to class as "part of the ordinary burden of financing" a class action); *Pinson v. Watkins*, No. 06-cv-0323, 2006 WL 1620323, at *2 (W.D. Okla. June 7, 2006) (plaintiff's lack of financial resources limited ability to represent adequately interests of class); *Rolex*, 136 F.R.D. at 666 ("If the representative client is not financially responsible, the attorneys have free rein over the prosecution of the action. This is tantamount to the unacceptable situation of the attorney being a member of the class of litigants while serving as class counsel" (internal quotations and citations omitted)). Here, Plaintiff made clear she will not be responsible for any litigation costs. Merryman Decl., ¶ 2.e., Ex. K.

Fourth, Plaintiff has abandoned claims available to the putative class by foregoing remedies against potential defendants SubscriberBASE, Inadco, United Quotes and the individual who submitted her information to the Branddeals Websites (who Plaintiff has not even tried to locate). *Wright v. Stone Container Corp.*, 524 F.2d 1058, 1062 (8th Cir. 1975) (class representative inadequate who failed to sue a potentially liable party); *Dubin v. Miller*, 132 F.R.D. 269, 272-73 (D. Colo. 1990) (class decertified where counsel selectively sued certain directors and officers of company, but

not others).  Plaintiff breached her duty of undivided loyalty to the class by failing to

pursue all potential defendants. *Dubin*, 132 F.R.D. at 272 ("[t]he omission to sue a

potential defendant cannot but prejudice the class").[14]

In addition, Plaintiff's counsel, despite experience with TCPA cases, is not

qualified to serve as class counsel here because they are not serving the best interests

of their client or the putative class.  Plaintiff's counsel failed to even explain to Plaintiff

that she had the option to file an individual small claims court action or show her the

draft complaint before filing it, failed to keep her informed regarding the lawsuit, allowed

her to abdicate all decision making responsibility to counsel, did not require her to be

responsible for costs, and did not pursue claims against other potentially responsible

parties.  Here, Plaintiff's counsel cannot serve as class counsel.

### E.    A Class Action Is Not Superior

Determining class membership and liability will require individual examination of

each putative class member to resolve, among other issues, whether he or she visited

the Branddeals Websites and submitted a number to be called about an insurance

quote. *See*, *supra*, Section III.B.  Courts routinely hold a class action is not superior and

"would not avoid duplicative lawsuits with potentially inconsistent results where, as here,

liability is determined by facts that are individual as to each plaintiff." *Forman*, 164

---

[14] Plaintiff has requested leave to pursue the case with a substitute class representative.  This
issue is the subject of a motion filed by Plaintiff that Bankrate will oppose.  Among other
reasons, pursuant to the Scheduling Order, the May 1, 2013 deadline for amending the
complaint passed.  Sched. Order, Dkt. No. 22, at 5; *see Rosales v. FitFlop USA, LLC*, No. 11-
cv-0973, 2013 WL 3049122, *2-4 (S.D. Cal. June 17, 2013) (denying request to substitute class
representative because plaintiff failed to move to amend scheduling order; deadline for
amending pleadings and adding parties passed).  The Court should deny Plaintiff's request.

LOSANGELES 1037000

F.R.D. at 405; *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1192 (9th Cir.

2001) ("If each class member has to litigate numerous and substantial separate issues

to establish his or her right to recover individually, a class action is not 'superior'").

A class action is also not superior if plaintiffs have sufficient financial incentive to

bring individual claims. *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 678 (7th Cir.

2001) (certification not superior where each proposed class member had substantial

individual claim); *Klotz*, 246 F.R.D. at 217 (incentives in the form of statutory damages,

attorney fees, and punitive damages "might not encourage each putative class member

to bring suit, but they dispel the notion that a class action is the only way to adjudicate

the lawfulness of the defendant's practices").

Here, the TCPA provides for a <u>minimum</u> recovery of $500 for each violation, or

treble damages ($1,500) if plaintiff can prove a willful or knowing violation. *Forman*, 164

F.R.D. at 404 (citing 47 U.S.C. § 227(b)(3)).  Congress provided statutory damages that

far exceed any actual monetary loss that could be incurred as a result of an unwanted

phone call. *Local Baking Prods., Inc. v. Kosher Bagel Munch, Inc.*, 421 N.J. Super. 268,

280 (App. Div. 2011) (noting in a TCPA case alleging defendant sent unsolicited faxes,

the harm "is about two cents worth of paper and maybe a little ink and toner" (internal

quotations omitted)).  Congress designed a statutory remedy that offers "adequate

incentive for an individual to bring suit on his own behalf." *Forman*, 164 F.R.D. at 404.

Class members who want to assert a claim under the TCPA can file an action in

small claims court without engaging a lawyer. *Local Baking Prods., Inc.*, 421 N.J.

37

Super. at 280.[15]  When compared to the amount of statutory damages recoverable under the TCPA, the cost of litigating an individual matter in small claims court would be minimal.  *Id.* at 281.  The combination of the TCPA's design and small claims court procedures "suggest that the benefit of a class action has been conferred on a litigant by the very nature of the procedures employed and relief obtained."  *Id.* at 280.

In cases that have found class actions are a superior mechanism for resolving a TCPA claim, individualized proof of consent is not typically at issue.  *Agne*, 286 F.R.D. at 562 (finding "no evidence in the record that any customer who received messages sent by [defendant] gave such consent"); *A&L Indus., Inc. v. P. Cippollini, Inc.*, No. 12-cv-07598, 2013 WL 5503303, at *1 (D.N.J. Oct. 2, 2013) (defendant sent faxes to numbers purchased from a database); *Sparkle Hill, Inc. v. Interstate Mat Corp.*, No. 11-cv-10271, 2012 WL 6589258, at *3 (D. Mass. Dec. 18, 2012) (same); *Kavu, Inc.*, 246 F.R.D. at 645 (defendant purchased list of fax numbers but, in violation of FCC regulation governing only faxes, failed to take reasonable steps to verify consent).[16]

Here, because resolution of the claims of putative class members would require hundreds, if not thousands, of mini-trials, there is no benefit to a class action instead of individual claims, all of which would have been resolved long ago.  *Local Baking Prods., Inc.*, 421 N.J. Super. at 281 (finding where facts required to prevail on a TCPA claim were identical to facts that would have to be proven to establish class membership,

---

[15] In Colorado, attorneys are not permitted in most small claims actions.  C.R.S. ¶ 13-6-407.

[16] Speight improperly summarizes *Macarz v. Transworld Sys., Inc.*, 193 F.R.D. 46, 54-55 (D. Conn. 2000).  That case involved an FDCPA claim, not a TCPA claim.  *Id.* at 49.  In any event, while the court found class treatment superior, resolution of the class claims did not require individual inquiry -- all putative class members received identical form letters and the court had already ruled on liability.  *Id.* at 49-50.

"[w]e discern no superiority in such a situation"); *Klotz*, 246 F.R.D. at 217 ("The potential efficiencies of a class action are not realized where an individual assessment of each putative class member's claims must be made."). Putative class members will expend as much time and money, in a less convenient forum,[17] litigating a class action as they will by filing an individual claim in small claims court to obtain $500-$1,500 per violation.

Further, requiring putative class members to pursue claims individually would weed out frivolous claims and prevent the waste of judicial resources. Individuals who believe Bankrate called without consent have incentive to file an action in small claims court to recover $500-$1,500 per violation. Individuals who visited the Branddeals Websites and knowingly provided their phone numbers, but who nevertheless fall within the proposed class definition would be less likely to file meritless claims.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion for class certification.

Dated:  December 17, 2013

Respectfully submitted,

WHITE & CASE LLP

By:    */s/ Bryan A. Merryman*
        Bryan A. Merryman
        Attorneys for Defendant
        Bankrate, Inc.

---

[17] The purpose of the Colorado Small Claims Division is to provide court accessibility at "times convenient to the persons using them, including evening and Saturday sessions," and with "personnel implementing and conducting" procedures who are "trained and equipped to assist anyone with a small claim in a friendly, efficient, and courteous manner." C.R.S. § 13-6-401. Parties have access to this division without needing an attorney and courts are not bound by formal rules of procedure, pleading, or evidence. C.R.S. §§ 13-6-407, 409.

LOSANGELES 1037000

## CERTIFICATE OF SERVICE

I, Bryan A. Merryman, hereby certify that on the 17th day of December, 2013, I electronically filed **DEFENDANT BANKRATE, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION, DECLARATION OF BRYAN A. MERRYMAN IN SUPPORT OF DEFENDANT BANKRATE, INC.'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION, DECLARATION OF J. JONATHAN HAWK IN SUPPORT OF DEFENDANT BANKRATE, INC.'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION, DECLARATION OF TRICIA WINKLER IN SUPPORT OF DEFENDANT BANKRATE, INC.'S OPPOSITION TO MOTION FOR CLASS CERTIFICATION,** and **DECLARATION OF PAUL ANDREW SPITZER, JR.** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses:

Steven L. Woodrow
swoodrow@edelson.com
Megan L. Lindsey
mlindsey@edelson.com
Edelson LLC
999 W. 18th St. #3000
Denver, CO 80202

Rafey S. Balabanian
rbalabanian@edelson.com
Benjamin J. Richman
brichman@edelson.com
Christopher Dore
cdore@edelson.com
Edelson LLC
350 North LaSalle, 13th Floor
Chicago, IL 60654

Stefan Coleman
law@stefancoleman.com
1072 Madison Ave. #1
Lakewood, NJ 08701

*/s/Bryan A. Merryman*

1

LOS ANGELES 1037499